## UNITED STATES DISTRICT AND BANKRUPTCY COURTS
### FOR THE DISTRICT OF COLUMBIA

**FILED**

**APR 2 0 2015**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

LARAY J BENTON, *Pro se*
1731 Stourbridge Court
Mitchellville, Maryland 20721

UNITED STATES OF AMERICA,
U.S. Attorney for the District of Columbia
Attn: Civil Process Clerk
555 4th Street, NW
Washington, DC 20530

UNITED STATES OF AMERICA,
United States Attorney General
Attn: Civil Process Clerk
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

CONSUMER FINANCIAL PROTECTION
BUREAU,
1700 G Street, NW
Washington, DC 20552

THE STATE OF SOUTH CAROLINA
1000 Assembly Street, Room 519
Columbia, SC 29201

Case: 1:15-cv-00599
Assigned To : Unassigned
Assign. Date : 4/20/2015
Description: Pro Se Gen. Civil  (F Deck)

                    Plaintiffs,


        VS.                                 CIVIL ACTION NO.


WELLS FARGO & COMPANY,
420 Montgomery Street Front
San Francisco, CA 94104-1205

WELLS FARGO BANK, N.A.,
One Home Campus
Des Moines, IA 50328

RECEIVED

MAR 3 0 2015

Clerk, U.S. District and
Bankruptcy Courts

RECEIVED

2015 MAR 30 P 4: 27

US DISTRICT &
BANKRUPTCY COURTS
CLERK.

HSBC NORTH AMERICA HOLDINGS
452 5th Avenue
New York, NY 10018

HSBC FINANCE CORPORATION
26525 North Riverwoods Boulevard
Mettawa, IL 60045

ROGERS TOWNSEND & THOMAS, PC
Synergy Business Park
220 Executive Center Drive
Columbia, SC 29210

SOUTHSTAR FUNDING LLC
400 Northridge Rd
Suite 1000
Atlanta, GA 30350-3328

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC
1818 Library St
Suite 300
Reston, VA 20190

Defendants.

## COMPLAINT

Now comes Mr. LaRay J. Benton, a former citizen of the State of South Carolina
(collectively, "Plaintiffs" or "Citizens"), *pro se*, and respectfully allege that pursuant to the
previous National Mortgage Settlement and "Consent Judgment" issued by this Court, Wells
Fargo & Company, Wells Fargo Bank, N.A. (WELLS FARGO), HSBC North America
Holdings, HSBC Finance Corporation (HSBC), Rogers Townsend & Thomas, PC (ROGERS),
Southstar Funding, LLC (SOUTHSTAR), and Mortgage Electronic Registration Systems, INC.
(MERS) (collectively or severantly referred to as "Defendants" or "WELLS FARGO" or
"HSBC" or "ROGERS" or "SOUTHSTAR" or "MERS" or the "Banks") violated, among other

Wells Fargo & Company in 2008. Collectively the two defendants identified in this paragraph are referred to here as "Wells Fargo." The business of Wells Fargo and its subsidiaries and affiliates includes the origination and servicing of mortgage loans.

6. Defendant HSBC Bank USA, National Association, (www.us.hsbc.com) an American subsidiary of UK-based HSBC Holdings plc, is a bank with its operational head office in New York City and its nominal head office in McLean, Virginia (as designated on its charter). HSBC Bank USA, N.A. is a national bank chartered under the National Bank Act, and thus is regulated by the Office of the Comptroller of the Currency (OCC), a part of the U.S. Department of the Treasury. The Hong Kong and Shanghai Banking Corporation acquired a 51% shareholding in Marine Midland Bank of New York State, headquartered in Buffalo, New York, in 1980 and extended to full ownership in 1987. The banks continued to operate under the Marine Midland name until 1998, when the offices were rebranded as HSBC Bank USA in line with the worldwide corporate identity of HSBC. In 1994, Marine Midland acquired Spectrum Home Mortgage, which operated in eight states. Then in 1995, Marine acquired United Northern Federal Savings Bank, with branches in Watertown and Lowville, New York. Marine Midland also acquired The Hongkong and Shanghai Banking Corporation's six New York City retail branches, and the next year Hang Seng Bank's two branches in New York City. That same year, Marine Midland acquired 11 branches from the East River Savings Bank in the New York Metropolitan area. Marine also acquired the US dollar clearing business of JPMorgan. At the same time, HSBC transferred two branches in the northwestern United States to HSBC Bank Canada. The next year, Marine completed its acquisition of First Federal Savings and Loan from Toronto-based CT Financial Services, for $620 million. First Federal Savings, headquartered in Rochester, had $7.2 billion in assets, 1,600 employees, 79 retail branches in New York State and 15 mortgage origination offices in nine states. In 1998, Marine Midland acquired First

Commercial Bank of Philadelphia, which had been established in 1989 as the first-state chartered

Asian-American bank in Pennsylvania. The bank served the local Asian community, which often

faced language and cultural barriers at traditional American banks. Marine paid $23.75 million

for First Commercial, which had $90 million in assets and $78 million in deposits in two

branches. After the acquisition of Republic National Bank in 1999, the head office of HSBC

Bank USA moved from One HSBC Center in Buffalo to 452 Fifth Avenue, New York City,

although the bank's charter lists the headquarters in Wilmington, Delaware. In 2004, HSBC

USA sold two upstate New York branches to Gloversville based City National Bank & Trust Co.

HSBC did not have enough nearby branches to give it economies of scale. On July 31, 2011,

First Niagara Financial Group, headquartered in Buffalo, announced that it had purchased all

HSBC's upstate New York branches for $1 billion. In December 2012, HSBC paid a record

$1,900,000,000 fine for laundering in excess of $881,000,000 in drug cartel money and violating

anti-terrorism sanctions.

7. Defendant Rogers Townsend & Thomas, PC was established in 1984 and serves

regional, national, and international clients. From their four offices in the Carolinas

(CHARLOTTE: Coliseum Centre, 2550 West Tyvola Road Suite 520, Charlotte, NC 28217;

COLUMBIA: Synergy Business Park, 220 Executive Center Drive, Columbia, SC 29210;

GREENVILLE: 401 North Main Street Suite 100, Greenville, SC 29601; and NORTH

CHARLESTON: 4000 Faber Place Drive Suite 300, North Charleston, SC 29405) and in St.

Thomas (8 Norre Gade, St. Thomas U.S. Virgin Islands, 00804) ROGERS provide service and

guidance to clients in a wide range of industries and practice areas. ROGERS also provides

counsel to the banking, default services, insurance, real estate, construction, corporate, and title

services sectors. Their attorneys handle administrative, bankruptcy, corporate finance, corporate

formation, labor and employment, development and zoning, estate planning, default services,

motor carriers, negligence, probate litigation, products liability, real estate, telecommunications, and water/wastewater matters.

8. Defendant Southstar Funding, LLC, with principal offices formally located at 400 Northridge Rd., Suite 1000, Atlanta, GA. 30350-3328, went out of business as per its Chapter 7 liquidation filing under bankruptcy. SOUTHSTAR offered wholesale mortgage financing for the residential mortgage industry.

9. Defendant Mortgage Electronic Registration Systems, INC (MERS), is a subsidiary of MERSCORP Holdings, Inc., with principal offices headquartered at 1818 Library St, Suite 300, Reston, VA 20190. MERSCORP Holdings, Inc. owns and operates the Mortgage Electronic Registration System (MERS) which tracks ownership and servicing rights that are originated in the United States. MERS is a privately held company. Its system is used by mortgage originators, servicers, warehouse lenders, wholesale lenders, retail lenders, document custodians, settlement agents, title companies, insurers, investors, county recorders and consumers. It keeps track of a confidential electronic registry of mortgages and modifications to servicing rights and ownership of the loans. MERS® Residential (also known as the MERS® System) is the only national database that provides free public access to servicer information for registered home mortgages, complementing public land recording systems that have their origins in centuries old real property laws. MERS and MERS® Residential were created by the mortgage banking industry to streamline the mortgage process by using electronic commerce. Beneficiaries of MERS include mortgage originators, servicers, warehouse lenders, wholesale lenders, retail lenders, document custodians, settlement agents, title companies, insurers, investors, county recorders and consumers. MERS acts as mortgagee in the county land records for the lender and servicer. Future assignments of any loan -- where MERS is the mortgagee -- registered on the MERS® System are not necessary because MERS remains the mortgagee no matter how many times

servicing is traded. MERS as original mortgagee (MOM) loans are approved by Fannie Mae, Freddie Mac, Ginnie Mae, the Federal Housing Administration and the U.S. Department of Veterans Affairs, California and Utah Housing Finance Agencies, as well as all of the major Wall Street rating agencies.

10. Defendants HSBC, ROGERS, SOUTHSTAR and MERS are "successors" or "servicers" or "trustees" of WELLS FARGO making them subject to ALL the terms and conditions of the formal National Mortgage Settlement agreement and the consent judgment previously issued against WELLS FARGO by this Court.

11. Defendants SOUTHSTAR and MERS conspired with WELLS FARGO to secure and service a 2nd mortgage lien on Mr. Benton's said property located at *114 D UNIVERSITY VILLAGE DR, CENTRAL, SC, 29630,* also making them subject to ALL the terms and conditions of the formal National Mortgage Settlement agreement and the consent judgment previously issued against WELLS FARGO by this Court.

12. For this Complaint, defendants WELLS FARGO, HSBC, ROGERS, SOUTHSTAR and MERS and all of their affiliated entities, during or prior to such time as they were affiliated, are referred to collectively as the "Defendants" or "Banks" or "WELLS FARGO" or "HSBC" or "ROGERS" or "SOUTHSTAR" or "MERS."

## BACKGROUND

### A. Statement of Hardship for LaRay J. Benton

13. Mr. Benton initially purchased the said property located at *114 D UNIVERSITY VILLAGE DR, CENTRAL, SC 29630* from Tiger Development LLC for the sum of $162,700.00 *See* Exhibit H. Mortgage funding and/or financing was secured through WELLS FARGO.

14. The reason why my loan is currently behind is as follows. My father is currently recovering from a stroke he had in July 2008, which left a huge financial burden on my family

with his loss of income, ongoing medical bills, and looming family expenses. For the last 5.5 years I've had to step in and fill the financial gap that he left and I've been the cornerstone for my family and the backbone for my mom ever since. With my dad out of work, and with the turning economy and job losses within my family to both my brother, two sisters, and brother in-law, I've had to absorb the additional burdens of having to put three (3) of my nephews on my medical and dental insurance; helping to pay for one of my nephews to finish college at Albany State University (Albany, GA); and continuing to help pay for my father's medical expenses each month which constantly exceeded $1000 a month. To add to my distress, my mother informed me in March 2011 that she needed me to step in help pay for some of my father's medical expenses. So again I had to step in to take care of my parents.

15. Mr. Benton had also formally communicated the above statements to WELLS FARGO in a "Hardship Letter" dated August 3, 2009, as part of his formal Loan Modification Request Package to the Loss Mitigation Department of Wells Fargo Home Mortgage. *See* Exhibit I.

**B. Overview of Unlawful Foreclosure Actions and Proceedings by HSBC in 2009**

16. On or about January 29, 2009, HSBC formally filed for an order granting foreclosure against Mr. Benton's property located at *114 D UNIVERSITY VILLAGE DR. CENTRAL, SC 29630. See* Exhibit J.

17. Mr. Benton asserts that he was NEVER formally served with this filed 2009 foreclosure action, which is a direct violation of the South Carolina Rules of Civil Procedure.

18. Mr. Benton asserts that upon receiving harassing delinquency notices in the mails and calls from representatives of WELLS FARGO, he entered into loan modification discussions with the Loss Mitigation Department of Wells Fargo Home Mortgage in or about April of 2009 to prevent the formal foreclosure of his home.

19. WELLS FARGO and HSBC actively continued foreclosure actions against the said property, even while they were actively discussing foreclosure alternatives and reviewing the requested loan modification documents submitted by Mr. Benton in or about July 2009. *See* Exhibit K.

20. On or about September 17, 2009, the Pickens County (Thirteenth Judicial Circuit) Court of Common Pleas for the State of South Carolina dismissed HSBC's foreclosure case against me pursuant to South Carolina Rules of Civil Procedure Rule 41(a). *See* Exhibit K.

21. Mr. Benton further asserts that WELLS FARGO never took any action to either approve or deny his loan modification request and support documents that the formally submitted to the Loss Mitigation Department of Wells Fargo Home Mortgage between April and September of 2009 to prevent the formal foreclosure of his home.

**C. Overview of Unlawful Foreclosure Actions and Proceedings by HSBC in 2011**

22. On or about June 13, 2011, HSBC again formally filed for an order granting foreclosure against Mr. Benton's property located at *114 D UNIVERSITY VILLAGE DR, CENTRAL, SC 29630. See* Exhibit L.

23. Mr. Benton asserts that he was NEVER formally served with this filed 2011 foreclosure action, which is a direct violation of the South Carolina Rules of Civil Procedure.

24. Mr. Benton asserts that upon receiving repeatedly harassing delinquency notices in the mails and calls from representatives of WELLS FARGO, he engaged WELLS FARGO and re-entered into loan modification discussions with the Loss Mitigation Department of Wells Fargo Home Mortgage to inquire about his previous Loss Mitigation application and documents that he had previously submitted in or about April of 2009.

25. WELLS FARGO and HSBC actively continued foreclosure actions against the said property, even while they were actively discussing foreclosure alternatives and reviewing the

requested loan modification documents that was re-submitted by Mr. Benton in or about September to October 2011. *See* Exhibit L.

26. On or about October 28, 2011, the Pickens County (Thirteenth Judicial Circuit) Court of Common Pleas for the State of South Carolina issued a judgment (Judgment No. 2011CP3901026) against me granting the Banks the foreclosure judgment that it unlawfully and willfully filed pertaining to Wells Fargo Home Mortgage loan numbers #0155386006 and #0155457831 for my home located at *114 D UNIVERSITY VILLAGE DR, CENTRAL, SC 29630.* *See* Exhibit L.

27. On or about October 28, 2011, a Foreclosure Sale date of December 5, 2011 was set for my home located at *114 D UNIVERSITY VILLAGE DR, CENTRAL, SC 29630. See* Pickens County Sentinel News Paper, Exhibit L.

28. Mr. Benton's home was unlawfully foreclosed on and sold by WELLS FARGO and HSBC on December 5, 2011 to one Anderson Area Properties LLC for the sum of $63,501.00. *See* Exhibits L and M.

29. Thage Properties LLC is now the current owner of Mr. Benton's former property. *See* Exhibit N.

30. Despite the unlawful foreclosure and sale of Mr. Benton's property buy HSBC, to date, WELLS FARGO is still currently reporting a negative credit history on Mr. Benton's credit profile for a "*Foreclosure Collateral Sold*" account (#708015538XXX) for the sum of $130,160; and another "*Charge Off*" account (#708015545XXXX) for the sum of $31,113.00. *See* Exhibit O.

## I. JURISDICTION AND VENUE

31. The U.S. District Court for the District of Columbia has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1331, 1345, and 1367, and under 12 U.S.C. 5565, and

over WELLS FARGO, HSBC, ROGERS, SOUTHSTAR and MERS (collectively and severantly the *Defendant*). The Complaint states a claim upon which relief may be granted against Defendant. Venue is appropriate in this District pursuant to 28 U.S.C. 1391(b)(2) and 12 U.S.C. 5564(f).

## II.    APPLICABILITY

32. Defendant's obligations as set forth in the February 2012, National Mortgage Settlement, and the *Consent Judgments* dated April 4, 2012 (Case No. 12-cv-00361-RMC) and equally and fully apply to the Defendant regardless of whether the Defendant is servicing or has serviced Mr. Benton's residential mortgage as a "servicer" or "sub-servicer" or "successor" or "trustee."

## III.    LEGAL STANDARDS

### A. Overview of Relevant Statues, Regulation, and Tort

33. Some of the relevant statues, regulation, and case law applicable to this case includes, but is not limited to the following:

**42 U.S. Code § 2000d - Prohibition against exclusion from participation in, denial of benefits of, and discrimination under federally assisted programs on ground of race, color, or national origin**

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

**12 U.S. Code Chapter 38A – Single Family Mortgage Foreclosure**

**12 U.S. Code § 3751 - Findings and purpose**

**(a) Findings**
The Congress finds that—

> **(1)** the disparate State laws under which mortgages are foreclosed on behalf of the Secretary covering 1- to 4-family residential properties—

   **(A)** burden certain programs administered by the Secretary;

   **(B)** increase the costs of collecting obligations; and

   **(C)** generally are a detriment to the community in which the properties are located;

**(2)** the long periods required to complete the foreclosure of such mortgages under certain State laws—

   **(A)** lead to deterioration in the condition of the properties involved;

   **(B)** necessitate substantial Federal holding expenditures;

   **(C)** increase the risk of vandalism, fire loss, depreciation, damage, and waste with respect to the properties; and

   **(D)** adversely affect the neighborhoods in which the properties are located;

**(3)** these conditions seriously impair the ability of the Secretary to protect the Federal financial interest in the affected properties and frustrate attainment of the objectives of the underlying Federal program authority;

**(4)** the availability of uniform and more expeditious procedures, with no right of redemption in the mortgagor or others, for the foreclosure of these mortgages by the Secretary will tend to ameliorate these conditions; and

**(5)** providing the Secretary with a nonjudicial foreclosure procedure will reduce unnecessary litigation by removing many foreclosures from the courts if they contribute to overcrowded calendars.

## (b) Purpose

The purpose of this chapter is to create a uniform Federal foreclosure remedy for single family mortgages that—

   **(1)** are held by the Secretary pursuant to title I or title II of the National Housing Act [12 U.S.C. 1702 et seq., 1707 et seq.]; or

   **(2)** secure loans obligated by the Secretary under section 1452b of title 42.

## Fair Credit Reporting Act (FCRA)

   FCRA is a United States federal law (codified at Title 15 United States Code Section 1681 and following) that regulates the collection, dissemination, and use of consumer information, including consumer credit information.

## 12 CFR Part 226 - TRUTH IN LENDING

§ 226.1 Authority, purpose, coverage, organization, enforcement, and liability.

**(a)** *Authority.* This regulation, known as Regulation Z, is issued by the Board of Governors of the Federal Reserve System to implement the federal Truth in Lending Act, which is contained in title I of the Consumer Credit Protection Act, as amended (15 U.S.C. 1601 *et seq.*). This regulation also implements title XII, section 1204 of the Competitive Equality Banking Act of 1987 (Pub. L. 100-86, 101 Stat. 552). Information-collection requirements contained in this regulation have been approved by the Office of Management and Budget under the provisions of 44 U.S.C. 3501 *et seq.* and have been assigned OMB No. 7100-0199.

**(b)** *Purpose.* The purpose of this regulation is to promote the informed use of consumer credit by requiring disclosures about its terms and cost. The regulation also includes substantive protections. It gives consumers the right to cancel certain credit transactions that involve a lien on a consumer's principal dwelling, regulates certain credit card practices, and provides a means for fair and timely resolution of credit billing disputes. The regulation does not generally govern charges for consumer credit, except that several provisions in Subpart G set forth special rules addressing certain charges applicable to credit card accounts under an open-end (not home-secured) consumer credit plan. The regulation requires a maximum interest rate to be stated in variable-rate contracts secured by the consumer's dwelling. It also imposes limitations on home-equity plans that are subject to the requirements of § 226.5b and mortgages that are subject to the requirements of § 226.32. The regulation prohibits certain acts or practices in connection with credit secured by a dwelling in § 226.36, and credit secured by a consumer's principal dwelling in § 226.35. The regulation also regulates certain practices of creditors who extend private education loans as defined in § 226.46(b)(5).

## 15 U.S. Code § 1681 - Congressional Findings and Statement of Purpose

**(a) Accuracy and fairness of credit reporting**
The Congress makes the following findings:

> **(1)** The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.
> **(2)** An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.
> **(3)** Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.
> **(4)** There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

**(b) Reasonable procedures**
It is the purpose of this subchapter to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter.

## 18 USC § 1001 – Statements or Entries Generally

**(a)** Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

   **(1)** falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
   **(2)** makes any materially false, fictitious, or fraudulent statement or representation; or
   **(3)** makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

**(b)** Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.

**(c)** With respect to any matter within the jurisdiction of the legislative branch, subsection (a) shall apply only to—

   **(1)** administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch; or
   **(2)** any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate.

## 18 U.S. Code § 1028 - Fraud and related activity in connection with identification documents, authentication features, and information

   **(a)** Whoever, in a circumstance described in subsection (c) of this section—

   **(1)** knowingly and without lawful authority produces an identification document, authentication feature, or a false identification document;
   **(2)** knowingly transfers an identification document, authentication feature, or a false identification document knowing that such document or feature was stolen or produced without lawful authority;

**(3)** knowingly possesses with intent to use unlawfully or transfer unlawfully five or more identification documents (other than those issued lawfully for the use of the possessor), authentication features, or false identification documents;

**(4)** knowingly possesses an identification document (other than one issued lawfully for the use of the possessor), authentication feature, or a false identification document, with the intent such document or feature be used to defraud the United States;

**(5)** knowingly produces, transfers, or possesses a document-making implement or authentication feature with the intent such document-making implement or authentication feature will be used in the production of a false identification document or another document-making implement or authentication feature which will be so used;

**(6)** knowingly possesses an identification document or authentication feature that is or appears to be an identification document or authentication feature of the United States or a sponsoring entity of an event designated as a special event of national significance which is stolen or produced without lawful authority knowing that such document or feature was stolen or produced without such authority;

**(7)** knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law; or

**(8)** knowingly traffics in false or actual authentication features for use in false identification documents, document-making implements, or means of identification; shall be punished as provided in subsection (b) of this section.

**(c)** The circumstance referred to in subsection (a) of this section is that—

**(1)** the identification document, authentication feature, or false identification document is or appears to be issued by or under the authority of the United States or a sponsoring entity of an event designated as a special event of national significance or the document-making implement is designed or suited for making such an identification document, authentication feature, or false identification document;

**(2)** the offense is an offense under subsection (a)(4) of this section; or

**(3)** either—

**(A)** the production, transfer, possession, or use prohibited by this section is in or affects interstate or foreign commerce, including the transfer of a document by electronic means; or

**(B)** the means of identification, identification document, false identification document, or document-making implement is transported in the mail in the course of the production, transfer, possession, or use prohibited by this section.

**(d)** In this section and section 1028A—

**(1)** the term "authentication feature" means any hologram, watermark, certification, symbol, code, image, sequence of numbers or letters, or other feature that either individually or in combination with another feature is used by the issuing authority on an

identification document, document-making implement, or means of identification to determine if the document is counterfeit, altered, or otherwise falsified;

**(2)** the term "document-making implement" means any implement, impression, template, computer file, computer disc, electronic device, or computer hardware or software, that is specifically configured or primarily used for making an identification document, a false identification document, or another document-making implement;

**(3)** the term "identification document" means a document made or issued by or under the authority of the United States Government, a State, political subdivision of a State, a sponsoring entity of an event designated as a special event of national significance, a foreign government, political subdivision of a foreign government, an international governmental or an international quasi-governmental organization which, when completed with information concerning a particular individual, is of a type intended or commonly accepted for the purpose of identification of individuals;

**(4)** the term "false identification document" means a document of a type intended or commonly accepted for the purposes of identification of individuals that—

> **(A)** is not issued by or under the authority of a governmental entity or was issued under the authority of a governmental entity but was subsequently altered for purposes of deceit; and

> **(B)** appears to be issued by or under the authority of the United States Government, a State, a political subdivision of a State, a sponsoring entity of an event designated by the President as a special event of national significance, a foreign government, a political subdivision of a foreign government, or an international governmental or quasi-governmental organization;

**(5)** the term "false authentication feature" means an authentication feature that—

> **(A)** is genuine in origin, but, without the authorization of the issuing authority, has been tampered with or altered for purposes of deceit;

> **(B)** is genuine, but has been distributed, or is intended for distribution, without the authorization of the issuing authority and not in connection with a lawfully made identification document, document-making implement, or means of identification to which such authentication feature is intended to be affixed or embedded by the respective issuing authority; or

> **(C)** appears to be genuine, but is not;

**(6)** the term "issuing authority"—

(A) means any governmental entity or agency that is authorized to issue identification documents, means of identification, or authentication features; and

(B) includes the United States Government, a State, a political subdivision of a State, a sponsoring entity of an event designated by the President as a special event of national significance, a foreign government, a political subdivision of a foreign government, or an international government or quasi-governmental organization;

(7) the term "means of identification" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any—

(A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;

(B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;

(C) unique electronic identification number, address, or routing code; or

(D) telecommunication identifying information or access device (as defined in section 1029 (e));

(8) the term "personal identification card" means an identification document issued by a State or local government solely for the purpose of identification;

(9) the term "produce" includes alter, authenticate, or assemble;

(10) the term "transfer" includes selecting an identification document, false identification document, or document-making implement and placing or directing the placement of such identification document, false identification document, or document-making implement on an online location where it is available to others;

(11) the term "State" includes any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any other commonwealth, possession, or territory of the United States; and

(12) the term "traffic" means—

(A) to transport, transfer, or otherwise dispose of, to another, as consideration for anything of value; or

(B) to make or obtain control of with intent to so transport, transfer, or otherwise dispose of.

## 18 U.S. Code § 1505 - Obstruction of proceedings before departments, agencies, and committees

Whoever, with intent to avoid, evade, prevent, or obstruct compliance, in whole or in part, with any civil investigative demand duly and properly made under the Antitrust Civil Process Act, willfully withholds, misrepresents, removes from any place, conceals, covers up, destroys, mutilates, alters, or by other means falsifies any documentary material, answers to written interrogatories, or oral testimony, which is the subject of such demand; or attempts to do so or solicits another to do so; or

Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, or the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress—

Shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both.

## 18 U.S. Code § 1621 - Perjury generally

Whoever—

> **(1)** having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

> **(2)** in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true;

is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.

## 18 U.S. Code § 1622 - Subornation of perjury

Whoever procures another to commit any perjury is guilty of subornation of perjury, and shall be fined under this title or imprisoned not more than five years, or both.

## 18 U.S. Code § 1623 - False declarations before grand jury or court

**(a)** Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.

**(b)** This section is applicable whether the conduct occurred within or without the United States.

**(c)** An indictment or information for violation of this section alleging that, in any proceedings before or ancillary to any court or grand jury of the United States, the defendant under oath has knowingly made two or more declarations, which are inconsistent to the degree that one of them is necessarily false, need not specify which declaration is false if—

> **(1)** each declaration was material to the point in question, and

> **(2)** each declaration was made within the period of the statute of limitations for the offense charged under this section.

In any prosecution under this section, the falsity of a declaration set forth in the indictment or information shall be established sufficient for conviction by proof that the defendant while under oath made irreconcilably contradictory declarations material to the point in question in any proceeding before or ancillary to any court or grand jury. It shall be a defense to an indictment or information made pursuant to the first sentence of this subsection that the defendant at the time he made each declaration believed the declaration was true.

**(d)** Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed.

**(e)** Proof beyond a reasonable doubt under this section is sufficient for conviction. It shall not be necessary that such proof be made by any particular number of witnesses or by documentary or other type of evidence.

## Breach of Contract

The violation of a contractual obligation. One may breach a contract by repudiating a promise, failing to perform a promise, or interfering with another party's performance.

## Breach of Fiduciary Duty

A fiduciary duty is an obligation to act in the best interest of another party. For instance, a corporation's board member has a fiduciary duty to the shareholders, a trustee has a fiduciary duty to the trust's beneficiaries, and an attorney has a fiduciary duty to a client. A fiduciary

obligation exists whenever the relationship with the client involves a special trust, confidence, and reliance on the fiduciary to exercise his discretion or expertise in acting for the client. The fiduciary must knowingly accept that trust and confidence to exercise his expertise and discretion to act on the client's behalf.

When one person does agree to act for another in a fiduciary relationship, the law forbids the fiduciary from acting in any manner adverse or contrary to the interests of the client, or from acting for his own benefit in relation to the subject matter. The client is entitled to the best efforts of the fiduciary on his behalf and the fiduciary must exercise all of the skill, care and diligence at his disposal when acting on behalf of the client. A person acting in a fiduciary capacity is held to a high standard of honesty and full disclosure in regard to the client and must not obtain a personal benefit at the expense of the client.

### 29 U.S. Code § 1109 - Liability for breach of fiduciary duty

**(a)** Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

**(b)** No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.

### Breach of Statutory Duty

Breach of a duty imposed on some person or body by a statute. The person or body in breach of the statutory duty is liable to any criminal penalty imposed by the statute, but may also be liable to pay damages to the person injured by the breach if he belongs to the class for whose protection the statute was passed. Not all statutory duties give rise to civil actions for breach. If the statute does not deal with the matter expressly, the courts must decide whether or not Parliament intended to confer civil remedies.

### Fraudulent Misrepresentation

Under contract law, a plaintiff can recover against a defendant on the grounds of fraudulent misrepresentation if (1) a representation was made; (2) that was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth; (4) that it was made with the intention that the plaintiff rely on it; (5) that the plaintiff did rely on it; and (6) that the plaintiff suffered damages as a result.

## IV.    SERVICING STANDARDS

34.  The Defendant shall comply with the Servicing Standards terms, requirements, and

conditions attached as Exhibits to each aforementioned Consent Judgment as follows:

- *WELLS FARGO shall comply with the Servicing Standards & Consumer Relief Requirements of order (Case No. 12-cv-00361-RMC) Exhibits A and D respectively, and Section A of order Exhibit E.*
- *HSBC shall comply with the Servicing Standards & Consumer Relief Requirements of order (Case No. 13-cv-02025-RMC) Exhibits A and C respectively, and Section A of order Exhibit D.*

## NATIONAL MORTGAGE SETTLEMENT

35.  In February 2012, 49 state attorneys general and the federal government announced a historic joint state-federal settlement with the country's five largest mortgage servicers which resulted in approximately $25 billion dollars in monetary sanctions and relief. The purpose of the accord was to enable hundreds of thousands of distressed homeowners to stay in their homes through enhanced loan modifications; to fund payments to victims of unfair foreclosure practices; and provide support for housing counseling and state-level foreclosure prevention programs, to name a few.  In addition to the monetary allocations, the settlement required comprehensive reforms of mortgage loan servicing. The mandated standards covered all aspects of mortgage servicing, from consumer response to foreclosure documentation. To ensure that the banks meet the new standards, the settlement was be recorded and became enforceable as a court judgment.

36.  The settlement was the result of ten months of intensive negotiations between the five banks and a coalition of state attorneys general and federal agencies, including the Departments of Justice, Treasury, and Housing and Urban Development. **The investigation began in October 2010 following revelations of widespread use of "robo-signed" affidavits in foreclosure proceedings across the country.** State attorneys general formed a working group to investigate the problem and to confront the banks about the allegations. The major mortgage servicing banks soon acknowledged that individuals had been signing thousands of foreclosure affidavits without reviewing the validity or accuracy of the sworn statements.  WELLS FARGO,

the mortgage company both HSBC, SOUTHSTAR, and MERS was servicing Mr. Benton's mortgage loan for, was one of the major banks that admitted to the said complaints, allegations of "robo-signing," and other allegations of misconduct. *See* Exhibits A and B.

37. Mr. Benton duly asserts that the prayers, motions, affidavits, and supporting documents filed in the Pickens County Thirteenth Judicial Circuit, South Carolina by HSBC, ROGERS, and/or their representatives is a result of willful and fraudulent "robo-signing" and misconduct, in "bad faith," with the specific intent to "foreclose" on Mr. Benton's property located at 114 D UNIVERSITY VILLAGE DR, CENTRAL, SC 29630.

38. Additionally, one of the specific settlement terms dubbed "***Consumer Relief***" in later court documents, required the five banks to allocate a total of $17 billion in assistance to borrowers who have the intent and ability to stay in their homes while making reasonable payments on their mortgage loans. At least 60 percent of the $17 billion was required to be allocated to reduce the principal balance of home loans for borrowers who are in default or at risk of default on their loan payments. Many homeowners, particularly in states like Florida, Arizona, Nevada and California, have negative equity in their homes and have no realistic ability of refinancing or selling their homes, or to build equity. Principal reductions would also yield lower payments and would give homeowners a fair opportunity to preserve their homes.

39. In addition to principal reductions, the banks must also allocate funds, approximately $5.2 billion, for other forms of homeowner assistance to include relocation assistance for homeowners facing foreclosure, waiving of deficiency balances, and funding for remediation of blighted properties.

## WELLS FARGO BANK, N.A. CONSENT JUDGMENT

40. On April 4, 2012 (Case No. 12-cv-00361-RMC), the U.S. District Court for the District of Columbia issued a "Consent Judgment" order against Wells Fargo & Company and

Wells Fargo Bank, N.A. (WELLS FARGO), et al, which was accepted and signed by Neil A.

Cotty, Chief Accounting Officer for BOA, of which was also consented and/or accepted by

WELLS FARGO which legally bounded HSBC, ROGERS, SOUTHSTAR, and MERS as the

"*Loan Servicer*" and/or "*Trustee*" for WELLS FARGO to the terms and conditions of the order

issue. *See* Exhibits A-F. Some of the relevant terms and/or requirements of the *Consent*

*Judgment* against WELLS FARGO applicable to Mr. Benton's case include, but are not limited

to:

- *WELLS FARGO shall comply with the Servicing Standards & Consumer Relief Requirements of order Exhibits A and D respectively, and Section A of order Exhibit E.*

- *The Consent Judgment shall remain in full force and effect for three and one-half years from the date it is entered ("the Term"), at which time Defendant's obligations under the Consent Judgment shall expire.*

### *EXHIBIT A - Settlement Term Sheet*

The provisions outlined below are intended to apply to loans secured by owner-occupied properties that serve as the primary residence of the borrower unless otherwise noted herein.

## I.   *FORECLOSURE AND BANKRUPTCY INFORMATION AND DOCUMENTATION.*

Unless otherwise specified, these provisions shall apply to bankruptcy and foreclosures in all jurisdictions regardless of whether the jurisdiction has a judicial, non-judicial or quasi-judicial process for foreclosures and regardless of whether a statement is submitted during the foreclosure or bankruptcy process in the form of an affidavit, sworn statement or declarations under penalty of perjury (to the extent stated to be based on personal knowledge) ("Declaration").

### A.  Standards for Documents Used in Foreclosure and Bankruptcy Proceedings.

1. Servicer shall ensure that factual assertions made in pleadings (complaint, counterclaim, cross-claim, answer or similar pleadings), bankruptcy proofs of claim (including any facts provided by Servicer or based on information provided by the Servicer that are included in any attachment and submitted to establish the truth of such facts) ("POC"), Declarations, affidavits, and sworn statements filed by or on behalf of Servicer in judicial foreclosures or bankruptcy proceedings and notices of default, notices of sale and similar notices submitted by or on behalf of Servicer in non-judicial foreclosures are accurate and complete and are supported by competent and reliable evidence. Before a loan is referred to non-judicial foreclosure, Servicer

shall ensure that it has reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information.

2. Servicer shall ensure that affidavits, sworn statements, and Declarations are based on personal knowledge, which may be based on the affiant's review of Servicer's books and records, in accordance with the evidentiary requirements of applicable state or federal law.

3. Servicer shall ensure that affidavits, sworn statements and Declarations executed by Servicer's affiants are based on the affiant's review and personal knowledge of the accuracy and completeness of the assertions in the affidavit, sworn statement or Declaration, set out facts that Servicer reasonably believes would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. Affiants shall confirm that they have reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and required loan ownership information. If an affiant relies on a review of business records for the basis of its affidavit, the referenced business record shall be attached if required by applicable state or federal law or court rule. This provision does not apply to affidavits, sworn statements and Declarations signed by counsel based solely on counsel's personal knowledge (such as affidavits of counsel relating to service of process, extensions of time, or fee petitions) that are not based on a review of Servicer's books and records. Separate affidavits, sworn statements or Declarations shall be used when one affiant does not have requisite personal knowledge of all required information.

8. Affidavits, sworn statements and Declarations shall not contain information that is false or unsubstantiated. This requirement shall not preclude Declarations based on information and belief where so stated.

**B. Requirements for Accuracy and Verification of Borrower's Account Information.**

1. Servicer shall maintain procedures to ensure accuracy and timely updating of borrower's account information, including posting of payments and imposition of fees. Servicer shall also maintain adequate documentation of borrower account information, which may be in either electronic or paper format.

2. For any loan on which interest is calculated based on a daily accrual or daily interest method and as to which any obligor is not a debtor in a bankruptcy proceeding without reaffirmation, Servicer shall promptly accept and apply all borrower payments, including cure payments (where authorized by law or contract), trial modification payments, as well as non-conforming payments, unless such application conflicts with contract provisions or prevailing law. Servicer shall ensure that properly identified payments shall be posted no more than two business days after receipt at the address specified by Servicer and credited as of the date received to borrower's account. Each monthly payment shall be applied in the order specified in the loan documents.

3. For any loan on which interest is not calculated based on a daily accrual or daily interest method and as to which any obligor is not a debtor in a bankruptcy proceeding without reaffirmation, Servicer shall promptly accept and apply all borrower conforming payments, including cure payments (where authorized by law

or contract), unless such application conflicts with contract provisions or prevailing law. Servicer shall continue to accept trial modification payments consistent with existing payment application practices. Servicer shall ensure that properly identified payments shall be posted no more than two business days after receipt at the address specified by Servicer. Each monthly payment shall be applied in the order specified in the loan documents.

   a.  Servicer shall accept and apply at least two non-conforming payments from the borrower, in accordance with this subparagraph, when the payment, whether on its own or when combined with a payment made by another source, comes within $50.00 of the scheduled payment, including principal and interest and, where applicable, taxes and insurance.

   b.  Except for payments described in paragraph I.B.3.a, Servicer may post partial payments to a suspense or unapplied funds account, provided that Servicer (1) discloses to the borrower the existence of and any activity in the suspense or unapplied funds account; (2) credits the borrower's account with a full payment as of the date that the funds in the suspense or unapplied funds account are sufficient to cover such full payment; and (3) applies payments as required by the terms of the loan documents. Servicer shall not take funds from suspense or unapplied funds accounts to pay fees until all unpaid contractual interest, principal, and escrow amounts are paid and brought current or other final disposition of the loan.

5. Servicer shall provide to borrowers (other than borrowers in bankruptcy or borrowers who have been referred to or are going through foreclosure) adequate information on monthly billing or other account statements to show in clear and conspicuous language:

   a.  total amount due;

   b.  allocation of payments, including a notation if any payment has been posted to a "suspense or unapplied funds account";

   c.  unpaid principal;

   d.  fees and charges for the relevant time period;

   e.  current escrow balance; and

   f.  reasons for any payment changes, including an interest rate or escrow account adjustment, no later than 21 days before the new amount is due (except in the case of loans as to which interest accrues daily or the rate changes more frequently than once every 30 days);

## II.   THIRD-PARTY PROVIDER OVERSIGHT.

### A. Oversight Duties Applicable to All Third-Party Providers.

Servicer shall adopt policies and processes to oversee and manage foreclosure firms, law firms, foreclosure trustees, subservicers and other agents, independent contractors, entities and third parties (including subsidiaries and affiliates) retained by or on behalf of Servicer that provide foreclosure, bankruptcy or mortgage servicing activities (including loss mitigation) (collectively, such activities are "Servicing Activities" and such providers are "Third-Party Providers"), including:

2. Servicer shall amend agreements, engagement letters, or oversight policies, or enter into new agreements or engagement letters, with Third-Party Providers to require them to comply with Servicer's applicable policies and procedures (which will incorporate any applicable aspects of this Agreement) and applicable state and federal laws and rules.

3. Servicer shall ensure that agreements, contracts or oversight policies provide for adequate oversight, including measures to enforce Third-Party Provider contractual obligations, and to ensure timely action with respect to Third-Party Provider performance failures.

## IV.   LOSS MITIGATION.

These requirements are intended to apply to both government-sponsored and proprietary loss mitigation programs and shall apply to subservicers performing loss mitigation services on Servicer's behalf.

### A. Loss Mitigation Requirements.

1. Servicer shall be required to notify potentially eligible borrowers of currently available loss mitigation options prior to foreclosure referral. Upon the timely receipt of a complete loan modification application, Servicer shall evaluate borrowers for all available loan modification options for which they are eligible prior to referring a borrower to foreclosure and shall facilitate the submission and review of loss mitigation applications. The foregoing notwithstanding, Servicer shall have no obligation to solicit borrowers who are in bankruptcy.

2. Servicer shall offer and facilitate loan modifications for borrowers rather than initiate foreclosure when such loan modifications for which they are eligible are net present value (NPV) positive and meet other investor, guarantor, insurer and program requirements.

3. Servicer shall allow borrowers enrolled in a trial period plan under prior HAMP guidelines (where borrowers were not pre-qualified) and who made all required trial period payments, but were later denied a permanent modification, the opportunity to reapply for a HAMP or proprietary loan modification using current financial information.

4. Servicer shall promptly send a final modification agreement to borrowers who have enrolled in a trial period plan under current HAMP guidelines (or fully underwritten proprietary modification programs with a trial payment period) and who have made the required number of timely trial period payments, where the modification is underwritten prior to the trial period and has received any necessary investor, guarantor or insurer approvals. The borrower shall then be converted by Servicer to a permanent modification upon execution of the final modification documents, consistent with applicable program guidelines, absent evidence of fraud.

### B. Dual Track Restricted.

1. If a borrower has not already been referred to foreclosure, Servicer shall not refer an eligible borrower's account to foreclosure while the borrower's complete application

for any loan modification program is pending if Servicer received (a) a complete loan modification application no later than day 120 of delinquency, or (b) a substantially complete loan modification application (missing only any required documentation of hardship) no later than day 120 of delinquency and Servicer receives any required hardship documentation no later than day 130 of delinquency. Servicer shall not make a referral to foreclosure of an eligible borrower who so provided an application until:

    a.  Servicer determines (after the automatic review in paragraph IV.G.1) that the borrower is not eligible for a loan modification, or

    b.  If borrower does not accept an offered foreclosure prevention alternative within 14 days of the evaluation notice, the earlier of (i) such 14 days, and (ii) borrower's decline of the foreclosure prevention offer.

2. If borrower accepts the loan modification resulting from Servicer's evaluation of the complete loan modification application referred to in paragraph IV.B.1 (verbally, in writing (including e-mail responses) or by submitting the first trial modification payment) within 14 days of Servicer's offer of a loan modification, then the Servicer shall delay referral to foreclosure until (a) if the Servicer fails timely to receive the first trial period payment, the last day for timely receiving the first trial period payment, and (b) if the Servicer timely receives the first trial period payment, after the borrower breaches the trial plan.

3. If the loan modification requested by a borrower as described in paragraph IV.B.1 is denied, except when otherwise required by federal or state law or investor directives, if borrower is entitled to an appeal under paragraph IV.G.3, Servicer will not proceed to a foreclosure sale until the later of (if applicable):

    a.  expiration of the 30-day appeal period; and

    b.  if the borrower appeals the denial, until the later of (if applicable) (i) if Servicer denies borrower's appeal, 15 days after the letter denying the appeal, (ii) if the Servicer sends if the borrower timely accepts the loan modification offer (verbally, in writing (including e-mail responses), or by making the first trial period payment), after the Servicer fails timely to receive the first trial period payment, and (iv) if the Servicer timely receives the first trial period payment, after the borrower breaches the trial plan.

4. If, after an eligible borrower has been referred to foreclosure, the Servicer receives a complete application from the borrower within 30 days after the Post Referral to Foreclosure Solicitation Letter, then while such loan modification application is pending, Servicer shall not move for foreclosure judgment or order of sale (or, if a motion has already been filed, shall take reasonable steps to avoid a ruling on such motion), or seek a foreclosure sale. If Servicer offers the borrower a loan modification, Servicer shall not move for judgment or order of sale, (or, if a motion has already been filed, shall take reasonable steps to avoid a ruling on such motion), or seek a foreclosure sale until the earlier of (a) 14 days after the date of the related offer of a loan modification, and (b) the date the borrower declines the loan modification offer. If the borrower accepts the loan modification offer (verbally, in writing (including e-mail responses) or by submitting the first trial modification payment) within 14 days after the date of the related offer of loan modification,

Servicer shall continue this delay until the later of (if applicable) (A) the failure by the Servicer timely to receive the first trial period payment, and (B) if the Servicer timely receives the first trial period payment, after the borrower breaches the trial plan.

5. If the loan modification requested by a borrower described in paragraph IV.B.4 is denied, then, except when otherwise required by federal or state law or investor directives, if borrower is entitled to an appeal under paragraph IV.G.3, Servicer will not proceed to a foreclosure sale until the later of (if applicable):
   a. expiration of the 30-day appeal period; and
   b. if the borrower appeals the denial, until the later of (if applicable) (i) if Servicer denies borrower's appeal, 15 days after the letter denying the appeal, (ii) if the Servicer sends borrower a letter granting his or her appeal and offering a loan modification, 14 days after the date of such offer, (iii) if the borrower timely accepts the loan modification offer (verbally, in writing (including e-mail responses), or by making the first trial period payment), after the failure of the Servicer timely to receive the first trial period payment, and (iv) if the Servicer timely receives the first trial period payment, after the borrower breaches the trial plan.

11. Servicer shall not move to judgment or order of sale or proceed with a foreclosure sale under any of the following circumstances:
   a. The borrower is in compliance with the terms of a trial loan modification, forbearance, or repayment plan;

## D. Loss Mitigation Communications with Borrowers.

1. Servicer shall commence outreach efforts to communicate loss mitigation options for first lien mortgage loans to all potentially eligible delinquent borrowers (other than those in bankruptcy) beginning on timelines that are in accordance with HAMP borrower solicitation guidelines set forth in the MHA Handbook version 3.2, Chapter II, Section 2.2, regardless of whether the borrower is eligible for a HAMP modification. Servicer shall provide borrowers with notices that include contact information for national or state foreclosure assistance hotlines and state housing counseling resources, as appropriate. The use by Servicer of nothing more than prerecorded automatic messages in loss mitigation communications with borrowers shall not be sufficient in those instances in which it fails to result in contact between the borrower and one of Servicer's loss mitigation specialists. Servicer shall conduct affirmative outreach efforts to inform delinquent second lien borrowers (other than those in bankruptcy) about the availability of payment reduction options. The foregoing notwithstanding, Servicer shall have no obligation to solicit borrowers who are in bankruptcy.

2. Servicer shall disclose and provide accurate information to borrowers relating to the qualification process and eligibility factors for loss mitigation programs.

4. Servicer shall cease all collection efforts while the borrower (i) is making timely payments under a trial loan modification or (ii) has submitted a complete loan modification application, and a modification decision is pending. Notwithstanding the above, Servicer reserves the right to contact a borrower to gather required loss mitigation documentation or to assist a borrower with performance under a trial loan modification plan.

**G. Independent Evaluation of First Lien Loan Modification Denials.**

1. Except when evaluated as provided in paragraphs IV.B.8 or IV.B.9, Servicer's initial denial of an eligible borrower's request for first lien loan modification following the submission of a complete loan modification application shall be subject to an independent evaluation. Such evaluation shall be performed by an independent entity or a different employee who has not been involved with the particular loan modification.

2. Denial Notice.
   a. When a first lien loan modification is denied after independent review, Servicer shall send a written non-approval notice to the borrower identifying the reasons for denial and the factual information considered. The notice shall inform the borrower that he or she has 30 days from the date of the denial letter declination to provide evidence that the eligibility determination was in error.
   b. If the first lien modification is denied because disallowed by investor, Servicer shall disclose in the written non-approval notice the name of the investor and summarize the reasons for investor denial.

**H. General Loss Mitigation Requirements.**

6. Servicer shall not make inaccurate payment delinquency reports to credit reporting agencies when the borrower is making timely reduced payments pursuant to a trial or other loan modification agreement. Servicer shall provide the borrower, prior to entering into a trial loan modification, with clear and conspicuous written information that adverse credit reporting consequences may result from the borrower making reduced payments during the trial period.

7. Where Servicer grants a loan modification, Servicer shall provide borrower with a copy of the fully executed loan modification agreement within 45 days of receipt of the executed copy from the borrower. If the modification is not in writing, Servicer shall provide the borrower with a written summary of its terms, as promptly as possible, within 45 days of the approval of the modification.

**M. Transfer of Servicing of Loans Pending for Permanent Loan Modification.**

1. Ordinary Transfer of Servicing from Servicer to Successor Servicer or Subservicer.

    a. At time of transfer or sale, Servicer shall inform successor servicer (including a subservicer) whether a loan modification is pending.

    b. Any contract for the transfer or sale of servicing rights shall obligate the successor servicer to accept and continue processing pending loan modification requests.

    c. Any contract for the transfer or sale of servicing rights shall obligate the successor servicer to honor trial and permanent loan modification agreements entered into by prior servicer.

    d. Any contract for transfer or sale of servicing rights shall designate that borrowers are third party beneficiaries under paragraphs IV.M.1.b and IV.M.1.c, above.

2. Transfer of Servicing to Servicer. When Servicer acquires servicing rights from another servicer, Servicer shall ensure that it will accept and continue to process pending loan modification requests from the prior servicer, and that it will honor trial and permanent loan modification agreements entered into by the prior servicer.

## IX. GENERAL PROVISIONS, DEFINITIONS, AND IMPLEMENTATION.

### A. Applicable Requirements.

1. The servicing standards and any modifications or other actions taken in accordance with the servicing standards are expressly subject to, and shall be interpreted in accordance with, (a) applicable federal, state and local laws, rules and regulations, including, but not limited to, any requirements of the federal banking regulators, (b) the terms of the applicable mortgage loan documents, (c) Section 201 of the Helping Families Save Their Homes Act of 2009, and (d) the terms and provisions of the Servicer Participation Agreement with the Department of Treasury, any servicing agreement, subservicing agreement under which Servicer services for others, special servicing agreement, mortgage or bond insurance policy or related agreement or requirements to which Servicer is a party and by which it or its servicing is bound pertaining to the servicing or ownership of the mortgage loans, including without limitation the requirements, binding directions, or investor guidelines of the applicable investor (such as Fannie Mae or Freddie Mac), mortgage or bond insurer, or credit enhancer (collectively, the "Applicable Requirements").

**HSBC, ROGERS, SOUTHSTAR and MERS are "successors" of WELLS FARGO and this clause makes them subject to ALL the terms and conditions of the formal National Mortgage Settlement agreement.**

### EXHIBIT D – Consumer Relief Requirement

Any Servicer as defined in the Servicing Standards set forth in Exhibit A to this Consent Judgment (hereinafter "Servicer" or "Participating Servicer") agrees that it will not implement any of the Consumer Relief Requirements described herein through policies that are intended to (i) disfavor a specific geography within or among states that are a party to the Consent Judgment or (ii) discriminate against any protected class of borrowers. To the extent a Servicer is responsible for the servicing of a mortgage loan to which these Consumer Relief Requirements may apply, the Servicer shall receive credit for all consumer relief and refinancing activities

undertaken in connection with such mortgage loan by any of its subservicers to the same extent as if Servicer had undertaken such activities itself.

## 1. First Lien Mortgage Modifications

    a. Servicer will receive credit under Table 1, Section 1, for first-lien mortgage loan modifications made in accordance with the guidelines set forth in this Section 1.

    b. First liens on occupied1 Properties with an unpaid principal balance ("UPB") prior to capitalization at or below the highest GSE conforming loan limit cap as of January 1, 2010 shall constitute at least 85% of the eligible credits for first liens (the "Applicable Limits").

    c. Eligible borrowers must be at least 30 days delinquent or otherwise qualify as being at imminent risk of default due to borrower's financial situation.

    d. Eligible borrowers' pre-modification loan-to-value ratio ("LTV") is greater than 100%.

    e. Post-modification payment should target a debt-to-income ratio ("DTI") of 31% (or an affordability measurement consistent with HAMP guidelines) and a modified LTV of no greater than 120%, provided that eligible borrowers receive a modification that meets the following terms:

        i. Payment of principal and interest must be reduced by at least 10%.

        ii. Where LTV exceeds 120% at a DTI of 31%, principal shall be reduced to a LTV of 120%, subject to a minimum DTI of 25% (which minimum may be waived by Servicer at Servicer's sole discretion), provided that for investor-owned loans, the LTV and DTI need not be reduced to a level that would convert the modification to net present value ("NPV") negative.

    j. Eligible modifications include any modification that is made on or after Servicer's Start Date, including:

        i. Write-offs made to allow for refinancing under the FHA Short Refinance Program;

        ii. Modifications under the Making Home Affordable Program (including the Home Affordable Modification Program ("HAMP") Tier 1 or Tier 2) or the Housing Finance Agency Hardest Hit Fund ("HFA Hardest Hit Fund") (or any other federal program) where principal is forgiven, except to the extent that state or federal funds paid to Servicer in its capacity as an investor are the source of a Servicer's credit claim.

        iii. Modifications under other proprietary or other government modification programs, provided that such modifications meet the guidelines set forth herein.

## 11. Applicable Requirements

The provision of consumer relief by the Servicer in accordance with this Agreement in connection with any residential mortgage loan is expressly subject to, and shall be interpreted in

accordance with, as applicable, the terms and provisions of the Servicer Participation Agreement with the U.S. Department of Treasury, any servicing agreement, subservicing agreement under which Servicer services for others, special servicing agreement, mortgage or bond insurance policy or related agreement or requirements to which Servicer is a party and by which it or its servicing affiliates are bound pertaining to the servicing or ownership of the mortgage loans, including without limitation the requirements, binding directions, or investor guidelines of the applicable investor (such as Fannie Mae or Freddie Mac), mortgage or bond insurer, or credit enhancer, provided, however, that the inability of a Servicer to offer a type, form or feature of the consumer relief payments by virtue of an Applicable Requirement shall not relieve the Servicer of its aggregate consumer relief obligations imposed by this Agreement, i.e., the Servicer must satisfy such obligations through the offer of other types, forms or features of consumer relief payments that are not limited by such applicable requirement.

## *EXHIBIT E – Enforcement Terms*

**G. Dispute Resolution Procedures.** Servicer, the Monitor, and the Monitoring Committee will engage in good faith efforts to reach agreement on the proper resolution of any dispute concerning any issue arising under this Consent Judgment, including any dispute or disagreement related to the withholding of consent, the exercise of discretion, or the denial of any application. Subject to Section J, below, in the event that a dispute cannot be resolved, Servicer, the Monitor, or the Monitoring Committee may petition the Court for resolution of the dispute. Where a provision of this agreement requires agreement, consent of, or approval of any application or action by a Party or the Monitor, such agreement, consent or approval shall not be unreasonably withheld.

**H. Consumer Complaints.** Nothing in this Consent Judgment shall be deemed to interfere with existing consumer complaint resolution processes, and the Parties are free to bring consumer complaints to the attention of Servicer for resolution outside the monitoring process. In addition, Servicer will continue to respond in good faith to individual consumer complaints provided to it by State Attorneys General or State Financial Regulators in accordance with the routine and practice existing prior to the entry of this Consent Judgment, whether or not such complaints relate to Covered Conduct released herein.

**I. Relationship to Other Enforcement Actions.** Nothing in this Consent Judgment shall affect requirements imposed on the Servicer pursuant to Consent Orders issued by the appropriate Federal Banking Agency (FBA), as defined in 12 U.S.C. § 1813(q), against the Servicer. In conducting their activities under this Consent Judgment, the Monitor and Monitoring Committee shall not impede or otherwise interfere with the Servicer's compliance with the requirements imposed pursuant to such Orders or with oversight and enforcement of such compliance by the FBA.

**J. Enforcement**

1. **Consent Judgment.** This Consent Judgment shall be filed in the U.S. District Court for the District of Columbia (the "Court") and shall be enforceable therein. Servicer and the Releasing Parties shall waive their rights to seek judicial review or otherwise challenge or contest in any court the validity or effectiveness of this Consent Judgment. Servicer and

the Releasing Parties agree not to contest any jurisdictional facts, including the Court's
authority to enter this Consent Judgment.

2. **Enforcing Authorities.** Servicer's obligations under this Consent Judgment shall be
enforceable solely in the U.S. District Court for the District of Columbia. An enforcement
action under this Consent Judgment may be brought by any Party to this Consent
Judgment or the Monitoring Committee. Monitor Report(s) and Quarterly Report(s) shall
not be admissible into evidence by a Party to this Consent Judgment except in an action
in the Court to enforce this Consent Judgment. In addition, unless immediate action is
necessary in order to prevent irreparable and immediate harm, prior to commencing any
enforcement action, a Party must provide notice to the Monitoring Committee of its intent
to bring an action to enforce this Consent Judgment. The members of the Monitoring
Committee shall have no more than 21 days to determine whether to bring an
enforcement action. If the members of the Monitoring Committee decline to bring an
enforcement action, the Party must wait 21 additional days after such a determination by
the members of the Monitoring Committee before commencing an enforcement action.

3. **Enforcement Action.** In the event of an action to enforce the obligations of Servicer and
to seek remedies for an uncured Potential Violation for which Servicer's time to cure has
expired, the sole relief available in such an action will be:

    (a) Equitable Relief. An order directing non-monetary equitable relief, including
injunctive relief, directing specific performance under the terms of this Consent
Judgment, or other non-monetary corrective action.

    (b) Civil Penalties. The Court may award as civil penalties an amount not more than
$1 million per uncured Potential Violation; or, in the event of a second uncured
Potential Violation of Metrics 1.a, 1.b, or 2.a (*i.e.*, a Servicer fails the specific
Metric in a Quarter, then fails to cure that Potential Violation, and then in
subsequent Quarters, fails the same Metric again in a Quarter and fails to cure that
Potential Violation again in a subsequent Quarter), where the final uncured
Potential Violation involves widespread noncompliance with that Metric, the
Court may award as civil penalties an amount not more than $5 million for the
second uncured Potential Violation.

**K. Sunset.** This Consent Judgment and all Exhibits shall retain full force and effect for three and
one-half years (until October 4, 2015) from the date it is entered (the "Term"), unless otherwise
specified in the Exhibit. Servicer shall submit a final Quarterly Report for the last quarter or
portion thereof falling within the Term, and shall cooperate with the Monitor's review of said
report, which shall be concluded no later than six months following the end of the Term, after
which time Servicer shall have no further obligations under this Consent Judgment.

## REAL PROPERTY TAX ASSESSED VALUE OF PROPERTY

41. Mr. Benton duly asserts that according to a March 30, 2015, print out of Pickens

County (South Carolina) Real Property Tax records for the tax period of July 1, 2013, to June 30,

2014, that the currently assessed real property value of the subject residence located at *114 D UNIVERSITY VILLAGE DR, CENTRAL, SC 29630*, is **$75,600.00**. *See* Exhibit P

### CURRENT AMOUNT OWED (DUE) ON PROPERTY

42. Mr. Benton duly asserts that according to the State of South Carolina court documents, HSBC has previously sold Mr. Benton's property to Anderson Area Developers, LLC for the sum of $63,501.00. However, according to recent printout of his credit profile dated January 10, 2015, WELLS FARGO is fraudulently reporting misleading and inaccurate foreclosure/charge off amounts totaling approximately $161,273.00. *See* Exhibit Q. However, this alleged outstanding balance and fraudulent credit reporting activity is in genuine dispute by Mr. Benton, namely because both WELLS FARGO and HSBC has reported different balances due or charge off amounts to each of the three major credit agencies (i.e. TransUnion), without giving any credit towards Mr. Benton for the forced sale of his property for the sum of $63,501.00 on or about December 5, 2011. Therefore the total amount owed on the property as listed in HSBC's formal foreclosure affidavits is inaccurate, in dispute, and unsubstantiated by the records presented by HSBC. As such, HSBC could not have lawfully foreclosed on the subject property because the total amount owed was in material and genuine dispute.

### COMPLAINANT OWES MORE THAN THE RESIDENCE IS WORTH

43. Mr. Benton duly asserts that according to the documentation above, that when his property was sold on December 5, 2011 by HSBC, he owed WELLS FARGO approximately **$100,000.00** more than the County assessed real property value was for his home, which clearly made his home eligible for multiple of the Federal loan modification programs and/or products as follows.

### GENERAL LOAN MODIFICATION INFORMATION

44. Mr. Benton duly asserts the following:

- Because of a financial hardship and family related medical expenses, he struggled to make his monthly mortgage payments to WELLS FARGO as agreed, and became delinquent on both his First and Second mortgage liens on the said property located at *114 D UNIVERSITY VILLAGE DR, CENTRAL, SC 29630.*
- That prior to the foreclosure of the above property, he was more than 90 days delinquent on his mortgage with WELLS FARGO/HSBC.
- That he obtained his mortgage on October 6, 2006. *See* Exhibit R.
- That he believes that his initial mortgage loan issued to him by WELLS FARGO, N.A., was insured or guaranteed by the Federal Housing Administration (FHA).
- That the property was not condemned
- That he owed less than $729,750.00 on the property. *See* Exhibits O-R.
- That he had sufficient, documented income to support a modified loan payment had it been offered to him by WELLS FARGO.
- That he has not been convicted within the last 10 years of a crime (i.e. felony, larceny, theft, fraud or forgery, money laundering or tax evasion, etc.) in connection with a mortgage or real estate transaction.

45.  Mr. Benton also dully asserts that to date, WELLS FARGO has NEVER formally communicated to him in any manner as to rather or not the two (2) loan modification applications, and the supporting documentation, that he submitted between April 2009 and December 2011 was either approved or denied for any reason, but simply mislead Mr. Benton in to believing that the parties were positively working towards a loan modification was a likely alternative to foreclosure, despite continuous foreclosure actions being filed. *See* Exhibit S.

## IV.   OVERVIEW OF RELEVANT FEDERAL PROGRAMS

**The Federal Housing Administration (FHA)**

46.  The FHA provides mortgage insurance on loans made by FHA approved lenders throughout the United States. Among other things, FHA insures mortgages on "single family" housing, which refers to one- to four- family dwellings. See, e.g., 12 U.S.C. § 1709; see generally 24 C.F.R. Part 203. 16. FHA mortgage insurance provides lenders with protection against losses when home buyers default on mortgage loans insured by FHA. See generally 12 U.S.C. § 1710, 24 C.F.R. Part 203.

47.  FHA-approved lenders, known as Direct Endorsement Lenders, ensure that loans meet strict underwriting criteria, including income-verification, credit analysis, and property appraisal, established by the FHA to be eligible for insurance. See 24 C.F.R. § 203.5(c)-(e) (Direct Endorsement requirements for underwriter due diligence, mortgagor income evaluation and appraisal).

48.  The FHA insurance operations are funded by a statutorily established Mutual Mortgage Insurance Fund (MMIF). 12 U.S.C. § 1708(a). The MMIF is sustained by insurance premiums, and the Secretary of the U.S. Department of Housing and Urban Development is required to provide for an annual actuarial study to assess the financial position of the MMIF. 12 U.S.C. § 1708(a)(4), (7).

49.  The FHA insurance program, by reducing the risk borne by approved lenders, is designed to stimulate lending to creditworthy borrowers, thereby increasing homeownership and aiding local communities in the form of community development, increased tax bases, and related benefits.

**The Single Family Mortgage Industry**

50.  The single family mortgage industry consists of financial services and other firms that originate, underwrite, securitize, and service mortgages for residential properties designed to house one- to four-family dwellings.  Mortgage origination is the process whereby a lender loans money to a borrower and receives a security interest in property, through a mortgage or comparable device that secures the loan. Origination generally includes all the steps from receiving a loan application through disbursal of the loan proceeds.

51.  For more than thirty years, mortgages typically have been "pooled" to create an investment vehicle, often denominated as a trust, and interests in the trusts have been sold to

investors that own interests in payment streams generated by principal and interest payments by the borrowers.

52. After mortgages are originated, a "servicer" is responsible for mortgage administration activities, known as servicing activities, which generally include collecting payments from mortgagors; applying payments made in an agreed-upon order to the mortgagor's indebtedness; distributing payments after allowable deductions to the investment trust entities for distribution to investors; making advances to cover delinquent mortgage payments and other costs, such as the costs of protecting and maintaining properties that collateralize mortgage loans when mortgagors fail to do so; pursuing collections from delinquent mortgagors; and pursuing either loss mitigation or foreclosure, as appropriate, to minimize the loss to investors and others when mortgagors become delinquent on mortgage payments.

**The United States' Stimulus / Rescue Efforts**

53. Beginning in the fall of 2008, the federal government instituted several measures to try to stabilize the housing and credit markets and assist troubled homeowners. In October 2008, the Emergency Economic Stabilization Act of 2008 (EESA) was passed to promote stability and liquidity in the financial system. Among other things, EESA authorized the Secretary of the Treasury to establish the Troubled Asset Relief Program (TARP). TARP funds were used, in part, to promote various mortgage loan modification programs.

**The Making Home Affordable (MHA) Program**

54. In March 2009, the United States launched the MHA Program. The MHA Program included the Home Affordable Modification Program (HAMP), a Treasury program that uses TARP funds to provide incentives for mortgage servicers to modify eligible first lien mortgages.

55. HAMP uses incentive payments to encourage loan servicers and owners of mortgage loans or bonds backed by mortgage loans to modify eligible first lien mortgages so that monthly

payments of homeowners who are in default or at imminent risk of default will be reduced to affordable and sustainable levels.

56. The Making Home Affordable ® Program (MHA) ® is an important part of the Obama Administration's comprehensive plan to stabilize the U.S. housing market by helping homeowners get mortgage relief and avoid foreclosure. To meet the various needs of homeowners across the country, Making Home Affordable ® programs offer a range of solutions that may be able to help you take action before it's too late.

- Refinance and take advantage of today's low mortgage interest rates.
- Reduce your monthly mortgage payments.
- Get mortgage relief while searching for re-employment.
- Get help when you owe more than your home is worth.
- Avoid foreclosure when homeownership is no longer affordable or desirable.

57. If a homeowner is having a tough time making your mortgage payments, the may be eligible for MHA's **Home Affordable Modification Program (HAMP®)**. HAMP is designed to provide deep and meaningful savings for homeowners devastated by unaffordable increases in expenses or reductions in income. Many mortgage companies (servicers) -- including Bank of America, JP Morgan Chase, Wells Fargo, and HSBC -- participate in MHA Programs. **A homeowner is eligible for HAMP if they meet the following criteria:**

- Because of a financial hardship, you are struggliing to make your mortgage payments.
- You are delinquent or in danger of falling behind on your mortgage.
- You obtained your mortgage on or before January 1, 2009.
- Your property has not been condemned.
- You owe up to $729,750 on your primary residence or one-to-four unit rental property (loan limits are higher for two- to four-unit properties).
- You have not been convicted within the last 10 years of a crime in connection with a mortgage or real estate transaction.

**http://www.makinghomeaffordable.gov/programs/lower-payments/Pages/hamp.aspx**

58. . Benton asserts that prior to the unlawful foreclosure of his home, he met all of the above stated MHA and HAMP criteria, making him eligible for this federal loan modification product.

**The Home Price Decline Protection Incentives (HPDP) initiative**

59. The HPDP initiative is designed to encourage modifications of loans in markets hardest hit by falling home prices. The HPDP initiative provides investors with additional incentives for loan modifications on properties located in areas where home prices have recently declined and where investors are concerned that price declines may persist.

60. Mr. Benton asserts that his residence is located in Pickens County, South Carolina, which was drastically affected by the national mortgage crisis, where thousands of home prices plummeted county-wide, making him and his home eligible for HPDP relief.

**The Principal Reduction Alternative (PRA)**

61. If the homeowner's home is currently worth significantly less than you owe on it, MHA's Principal Reduction Alternative (PRA) was designed to help you by encouraging mortgage servicers and investors to reduce the amount you owe on your home. You may be eligible for PRA if:

- Your mortgage is not owned or guaranteed by Fannie Mae or Freddie Mac.
- You owe more than your home is worth.
- You occupy the house as your primary residence.
- You obtained your mortgage on or before January 1, 2009.
- Your mortgage payment is more than 31 percent of your gross (pre-tax) monthly income.
- You owe up to $729,750 on your 1st mortgage.
- You have a financial hardship and are either delinquent or in danger of falling behind.
- You have sufficient, documented income to support the modified payment.
- You must not have been convicted within the last 10 years of felony larceny, theft, fraud or forgery, money laundering or tax evasion, in connection with a mortgage or real estate transaction.

**http://www.makinghomeaffordable.gov/programs/lower-payments/Pages/pra.aspx**

62. Mr. Benton asserts that prior to the foreclosure of his home, he met all of the above stated MHA PRA criteria, making him eligible for this loan modification product.

**The Home Affordable Unemployment Program (UP)**

63. UP is designed to offer assistance to unemployed homeowners through temporary forbearance of a portion of their mortgage payments.

64. Mr. Benton asserts that for a period of over five (5) months, he was dully "unemployed and was eligible for the UP forbearance program.

**The FHA-HAMP Program**

65. The FHA-HAMP Program is designed to provide compensation to the holders and servicers of FHA-insured mortgages that are modified under FHA-HAMP, to reduce payments to more affordable levels. FHA, VA and USDA all offer mortgage modification programs for struggling homeowners designed to lower monthly mortgage payment to no more than 31 percent of the homeowner's verified monthly gross (pre-tax) income — making monthly mortgage payments much more affordable. If a homeowner has a loan that is insured or guaranteed by the Federal Housing Administration (FHA)**,** they may be eligible for a program offered through that government agency.

**http://www.makinghomeaffordable.gov/programs/lower-payments/Pages/fha-hamp.aspx**

66. Mr. Benton asserts that he believes that his initial mortgage loan issued to him by WELLS FARGO., was insured or guaranteed by the Federal Housing Administration (FHA), making him eligible for this loan modification product.

**The FHA Refinance for Borrowers with Negative Equity (FHA Short Refinance) Program**

67. This program is partially supported by TARP funds and allows servicers and investors who write down a borrower's principal balance on a non-FHA-insured, existing, underwater, first-lien mortgage loan in connection with a refinancing to obtain FHA insurance on the newly refinanced mortgage. Treasury has provided a TARP-funded letter of credit for up to $8 billion in loss coverage on these newly refinanced FHA loans.

68. Mr. Benton asserts that prior to HSBC foreclosing on his home, his residence had "Negative Equity" which qualifies him for the FHA Short Refinance Program.

**Housing Finance Agency Hardest Hit Fund (HHF)**

69. HHF is a TARP-funded program designed to fund foreclosure prevention programs run by state housing finance agencies in states hit hardest by the decrease in home prices and in states with high unemployment rates. Eighteen states and Washington, D.C. have received approval for aid through this program.

70. Mr. Benton asserts that his residence is located in Pickens County, South Carolina was affected by the national mortgage crisis, where thousands of home prices plummeted county-wide, making him and his home eligible for HHF relief.

## V.    **PREVIOUSLY APPROVED, OFFERED & ACCEPTED LOAN MODIFICATION**

71. Mr. Benton duly asserts that NO alternative loss mitigation products or programs was offered to him by WELLS FARGO nor HSBC as a formal alternative to foreclosure.

## VI.    **FACTUAL ALLEGATIONS**

**A. The Banks' Servicing Misconduct**

72. Each of the Banks services home mortgage loans secured by residential properties owned by individual citizens of the Plaintiff State, and of the United States.

73. Each Bank is engaged in trade or commerce in each of the Plaintiff States and is subject to the consumer protection laws of the States in the conduct of their debt collection, loss

mitigation and foreclosure activities. The consumer protection laws of the Plaintiff States include

laws prohibiting unfair or deceptive practices.

### 1. The Banks' Unfair, Deceptive, and Unlawful Servicing Processes

74.   Under the States' consumer protection laws, the Banks are prohibited from engaging

in unfair or deceptive practices with respect to consumers.

75.   In the course of their conduct, management and oversight of loan servicing in the

Plaintiff States, the Banks have engaged in a pattern of unfair and deceptive practices.

76.   The Banks' unfair and deceptive practices in the discharge of their loan servicing

activities, include, but are not limited to, the following:

      a.   failing to timely and accurately apply payments made by borrowers and failing to
         maintain accurate account statements;
      b.   charging excessive or improper fees for default-related services;
      c.   failing to properly oversee third party vendors involved in servicing activities on
         behalf of the Banks;
      d.   imposing force-placed insurance without properly notifying the borrowers and
         when borrowers already had adequate coverage;
      e.   providing borrowers false or misleading information in response to borrower
         complaints; and
      f.   failing to maintain appropriate staffing, training, and quality control systems.

### 2. The Banks' Unfair, Deceptive, and Unlawful Loan Modification and Loss

### Mitigation Processes

77.   Under the States' consumer protection laws, the Banks are prohibited from engaging

in unfair or deceptive practices with respect to consumers.

78.   Pursuant to HUD regulations and FHA guidance, FHA-approved mortgage lenders

and their servicers are required to engage in loss-mitigation efforts to avoid the foreclosure of

HUD-insured single family residential mortgages. E.g., 24 C.F.R. § 203.500 et seq.; Mortgagee

Letter 2008-07 ("Treble Damages for Failure to Engage in Loss Mitigation") (Sept. 26, 2008);

Mortgagee Letter 1996-25 ("Existing Alternatives to Foreclosure -- Loss Mitigation") (May

8, 1996). Thus, when acting as a servicer, the Banks were required to refrain from foreclosing on any FHA insured mortgage where a default could be addressed by modifying the terms of the mortgage or other less-costly alternatives to foreclosure were available.

79. Under the Treasury's various rescue and stimulus programs, the Banks received monetary incentives from the Federal government in exchange for the commitment to make efforts to modify defaulting borrowers' single family residential mortgages. See, e.g., Making Home Affordable Handbook v.1.0, ch. 13 ("Incentive Compensation") (Aug. 19, 2010). Under the programs, the Banks agreed to fulfill requirements set forth in program guidelines and servicer participation agreements.

80. Each of the Banks regularly conducts or manages loan modifications on behalf of the entities that hold the loans and mortgages and that hired the Banks as servicers.

81. In the course of their servicing and oversight of mortgage loans, the Banks violated federal laws, program requirements and contractual requirements governing loss mitigation.

82. In the course of their conduct, management and oversight of loan modifications in the plaintiff States, the Banks have engaged in a pattern of unfair and deceptive practices.

83. The Banks' failure to discharge their required loan modification obligations, and related unfair and deceptive practices, include, but are not limited to, the following:

      a.  failing to perform proper loan modification underwriting;
      b.  failing to gather or losing loan modification application documentation and other paper work;
      c.  failing to provide adequate staffing to implement programs;
      d.  failing to adequately train staff responsible for loan modifications;
      e.  failing to establish adequate processes for loan modifications;
      b.  allowing borrowers to stay in trial modifications for excessive time periods;
      c.  wrongfully denying modification applications;
      d.  failing to respond to borrower inquiries;
      e.  providing false or misleading information to consumers while referring loans to foreclosure during the loan modification application process;

    f.  providing false or misleading information to consumers while initiating foreclosures where the borrower was in good faith actively pursuing a loss mitigation alternative offered by the Bank;

    g.  providing false or misleading information to consumers while scheduling and conducting foreclosure sales during the loan application process and during trial loan modification periods;

    h.  failing to provide accurate and timely information to borrowers who are in need of, and eligible for, loss mitigation services, including loan modifications;

    i.  miscalculating borrowers' eligibility for loan modification programs and improperly denying loan modification relief to eligible borrowers;

    j.  misleading borrowers by representing that loan modification applications will be handled promptly when Banks regularly fail to act on loan modifications in a timely manner;

    k.  failing to properly process borrowers' applications for loan modifications, including failing to account for documents submitted by borrowers and failing to respond to borrowers' reasonable requests for information and assistance;

    l.  s. misleading borrowers by providing false or deceptive reasons for denial of loan modifications.

### 3.  Wrongful Conduct Related to Foreclosures

84.  Under the States' consumer protection laws, the Banks are prohibited from engaging in unfair or deceptive practices with respect to consumers.

85.  FHA regulations and guidance and HAMP and other MHA servicer participation agreements establish requirements to be followed in the foreclosure of single family residential mortgages that are FHA insured, or where the servicer conducting the foreclosure is an MHA participant.

86.  Each of the Banks regularly conducts or manages foreclosures on behalf of entities that hold mortgage loans and have contracted with the Bank to service such loans.

87.  In the course of their conduct, management, and oversight of foreclosures, the Banks violated FHA and MHA foreclosure requirements.

88.  In the course of their conduct, management, and oversight of foreclosures in the plaintiff States, the Banks have engaged in a pattern of unfair and deceptive practices.

89. The Banks' failure to follow appropriate foreclosure procedures, and related unfair and deceptive practices include, but are not limited to, the following:

    a.  failing to properly identify the foreclosing party;

    b.  charging improper fees related to foreclosures;

    c.  preparing, executing, notarizing or presenting false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments);

    d.  preparing, executing, or filing affidavits in foreclosure proceedings without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits. This practice of repeated false attestation of information in affidavits is popularly known as "robosigning." Where that were not properly notarized in accordance with applicable state law;

    e.  misrepresenting the identity, office, or legal status of the affiant executing foreclosure-related documents;

    f.  inappropriately charging servicing, document creation, recordation and other costs and expenses related to foreclosures; and

    g.  inappropriately dual-tracking foreclosure and loan modification activities, and failing to communicate with borrowers with respect to foreclosure activities.

## B. The Banks' Origination Misconduct

### 1. The Direct Endorsement Program

90. The FHA's Direct Endorsement Program is a vital part of its single-family insured mortgage program. Under the Direct Endorsement Program, the FHA does not review or approve borrower loan applications. Rather, the FHA approves lenders, called Direct Endorsement Lenders (DE Lenders), which have the responsibility and obligation for underwriting the loan and determining whether a proposed mortgage is eligible for FHA insurance according to FHA rules and requirements. Unconditional DE Lenders employ Direct Endorsement Underwriters, who are authorized to perform the underwriting of mortgage loans to be insured by the FHA. The DE Lenders give the FHA full information and documentation about an underwritten loan only after the mortgage has closed, and both the underwriter and DE Lender certify compliance with FHA requirements in submitting the loan for mortgage insurance. Although the FHA conducts

regular desk reviews and brings enforcement actions, the FHA does not, and given its resources cannot, review the details of every loan. The FHA therefore relies on the underwriter's and DE Lender's certifications and due diligence as evidence of the insurability of a mortgage.

91.  FHA regulations provide that each DE Lender owes the FHA the duty to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R. § 203.5(c). DE Lenders also owe the FHA a common law duty of due diligence. See 48 Fed. Reg. 11928, 11932 (Mar. 22, 1983). In addition, a fiduciary relationship exists between DE Lenders and the FHA. DE Lenders have a duty to the FHA to act with the utmost good faith, candor, honesty, integrity, fairness, undivided loyalty, and fidelity, and to refrain from taking advantage of the FHA by misrepresentation or lack of disclosure. DE Lenders are required to exercise sound judgment, prudence, and due diligence on behalf of the FHA in endorsing mortgages for FHA insurance.

92.  DE Lenders are required to be familiar with, and to comply with, the current versions of governing FHA Handbooks and Mortgagee Letters, including HUD Handbook 4155.1, Mortgage Credit Analysis for Mortgage Insurance on One- to Four-Unit Mortgage Loans, HUD Handbook 4155.2, Lender's Guide to the Single Family Mortgage Insurance Process, and HUD Handbook 4150.2, Valuation Analysis for Single Family One- to Four-Unit Dwellings.

## 2.  Failure to Comply With Quality Control Requirements

93.  To qualify as a DE Lender, a lender has to have a fully functioning Quality Control (QC) Program that complies with FHA requirements from the date of its initial FHA approval until final surrender or termination of its approval.

94.  QC plans ensure that DE Lenders follow all the FHA requirements, ensure that procedures and personnel used by DE Lenders meet FHA requirements, and provide for the

correction, where necessary, and reporting of problems once a DE Lender becomes aware of their existence.

95.  The Banks failed to dedicate sufficient staff to QC.

96.  The Banks failed to address dysfunctions in their QC system.

97.  To get and maintain DE Lender status, a DE Lender has to submit an annual certification to the FHA, stating that it conforms to all HUD/FHA regulations, handbooks, and policies.

**C.  The Banks' Foreclosure-Related Misconduct**

98.  In the ordinary course of their businesses, the Banks regularly appear as creditors, or on behalf of creditors, in foreclosure cases, including foreclosure cases commenced in this district and over which this Court has original jurisdiction under 28 U.S.C. § 1345, including proofs of claim and motions seeking the payment of money from material false and fraudulently file foreclosure related documents, misrepresentations, and proceedings.

99.  The Banks have foreclosure procedures that are utilized or relied upon by the Banks and their attorneys, contractors, and other agents when the Banks file documents, including proofs of claim and motions seeking the payment of money from material false and fraudulently file foreclosure related documents, misrepresentations, and proceedings.  Use of these foreclosure procedures has resulted in an insufficient level of oversight and safeguards regarding pleadings and documents filed by the Banks or their agents in foreclosure cases and their conduct during the foreclosure cases.

100.  Use of these foreclosure procedures has resulted in the filing of signed pleadings and documents in foreclosure cases as to which the signatory has not conducted a reasonable inquiry into the factual contentions or allegations, as required by applicable law, including Fed. R. Civ. P. 11 and Fed. R. Bankr. P. 9011.

101.  Use of these foreclosure procedures has also resulted in a failure to exercise
adequate supervision over the Banks' attorneys, contractors, and other agents in foreclosure
proceedings.

102.  As a result of the use of inadequate foreclosure procedures, the conduct of the
Banks or their agents has resulted in, among other things, some or all of the following:

   a.  making representations that were inaccurate, misleading, false, or for which the
       Banks, at the time, did not have a reasonable basis to make, including without
       limitation representations contained in proofs of claim under 12 U.S. Code
       Chapter 38A, Real Property Article, §7-105.1 of the Maryland Code, the Virginia
       Code, or other documents;
   b.  filing proofs of claim, motions for relief from stay, or other documents that failed
       to include documentation required under 12 U.S. Code Chapter 38A, local court
       rules, local court standing orders, or other applicable rules or law, such as the
       original or a duplicate of the writing on which the secured claim is based,
       evidence that the security interest has been perfected, a statement setting forth the
       terms of and any documentation of a transfer of the claim, or other
       documentation;
   c.  filing materially false, fictitious, and fraudulent affidavits in connection with
       proofs of claim, foreclosure proceedings, or other documents that were inaccurate,
       misleading, or false, or for which the Banks, at the time, did not have a reasonable
       basis to make;
   d.  filing materially false, fictitious, and fraudulent affidavits in connection with
       proofs of claim, foreclosure proceedings, or other documents where the Banks
       sought payment from the debtor for amounts that the Banks were not legally
       entitled to collect, such as seeking principal, interest, fees, escrow amounts,
       and/or advances (i.e. down payments) that were not incurred, were in excess of
       what is collectable under the loan documents, were not reasonable or appropriate
       to protect the note holder's interest in the property and rights under the security
       instrument, or were inconsistent with an approved loan modification;
   e.  filing proofs of claim or motions for right to foreclose without required
       itemizations for principal, interest, fees, escrow amounts, and/or advances;
   f.  filing proofs of claim, motions for right to foreclose, or other documents that
       inaccurately represented or failed to document ownership of the claim or right to
       seek relief;
   g.  commencing collection and foreclosure activities against the debtor or the
       debtor's property without court authorization, or in violation of the terms of 12
       U.S. Code Chapter 38A, Real Property Article, §7-105.1 of the Maryland Code,
       the Virginia Code;
   h.  filing proofs of claim, motions for right to foreclose, or other documents or
       otherwise commencing collection activities seeking to recover amounts on debts
       that have been paid or satisfied;

     i.   collecting, or attempting to collect, attorney's fees and other charges for the preparation and filing of proofs of claim, motions for right to foreclose, or other documents, that the Banks willfully knew were materially false, fraudulent, fictious, and unsubstantiated;

     j.   failing to promptly and accurately apply payments resulting in inaccurate loan accounting and wrongful or inaccurate allegations of loan defaults;

     k.   filing proofs of claim, motions for right to foreclose, or other documents that inaccurately or falsely represented they were signed by a person with direct knowledge of the matters alleged in the filing;

     b.   filing affidavits or other documents requiring notarization where the Banks inaccurately or falsely represented that the information was true, accurate, up to date, and that the documents were validly notarized;

     c.   failing to provide required notices to the debtor, trustee, or the court regarding payment changes resulting from a change in interest rate and/or escrow charges;

     d.   failing to provide notice to the debtor, trustee, or court regarding fees, charges, and expenses assessed or incurred after the petition date; or

     e.   failing to promptly provide a reconciliation of payments received with respect to the debtor's obligations in the case or failing to appropriately update the Banks' systems of record, including upon filing motions for right to foreclose, dismissal or closure of a foreclosure case.

103.  The Banks implemented and relied upon inadequate foreclosure procedures despite having actual or constructive notice that such procedures could, and did, lead to the errors described above.

104.  Use of these foreclosure procedures has also resulted in the Banks seeking inappropriate relief from debtors under the Foreclosure Code, including under 12 U.S. Code Chapter 38A - SINGLE FAMILY MORTGAGE FORECLOSURE.

## COUNT I

### UNFAIR AND DECEPTIVE CONSUMER PRACTICES
### WITH RESPECT TO LOAN SERVICING

105.  The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

106.  The loan servicing conduct of the Banks, as described above, constitutes unfair or deceptive practices in violation of the United States Code and the consumer protection laws of each State.

107.  The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

## COUNT II

## DISCRIMINATION WITH RESPECT TO LOAN SERVICING

108.  The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

109.  The loan servicing conduct of the Banks, as described above, constitutes discrimination in violation of the United States Code and the consumer protection laws of each State.

110.  The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

## COUNT III

**FRAUDULENT MISREPRESENTATIONS WITH RESPECT TO LOAN SERVICING**

111. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

112. The loan servicing conduct of the Banks, as described above, constitutes fraudulent misrepresentations in violation of the United States Code and the consumer protection laws of each State.

113. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

## COUNT IV

## FRAUD WITH RESPECT TO LOAN SERVICING

114. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

115. The loan servicing conduct of the Banks, as described above, constitutes fraud in violation of the United States Code and the consumer protection laws of each State.

116. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss

mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

## COUNT V

## OBSTRUCTION WITH RESPECT TO LOAN SERVICING

117. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

118. The loan servicing conduct of the Banks, as described above, constitutes obstruction in violation of the United States Code and the consumer protection laws of each State.

119. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

## COUNT VI

## PERJURY WITH RESPECT TO LOAN SERVICING

120. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

121.  The loan servicing conduct of the Banks, as described above, constitutes perjury in violation of the United States Code and the consumer protection laws of each State.

122.  The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

## COUNT VII

## SUBORDINATION OF PERJURY WITH RESPECT TO LOAN SERVICING

123.  The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

124.  The loan servicing conduct of the Banks, as described above, constitutes subordination of perjury in violation of the United States Code and the consumer protection laws of each State.

125.  The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had

to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks'
unlawful conduct.

## COUNT VIII

## FALSE DECLARATIONS BEFORE COURT WITH RESPECT TO LOAN SERVICING

126.  The allegations in paragraphs 1 through 104 above are incorporated herein by
reference.

127.  The loan servicing conduct of the Banks, as described above, constitutes false
declarations or misrepresentations before Court in violation of the United States Code and the
consumer protection laws of each State.

128.  The Banks' unlawful conduct has resulted in injury to the States and citizens of the
States who have had home loans serviced by the Banks. The harm sustained by such citizens
includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss
mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to
improper, unlawful, or undocumented foreclosures. The harm to the States includes the
subversion of their legal process and the sustained violations of their laws. The States have had
to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks'
unlawful conduct.

## COUNT IX

## BREECH OF CONTRACT WITH RESPECT TO LOAN SERVICING

129.  The allegations in paragraphs 1 through 104 above are incorporated herein by
reference.

130. The loan servicing conduct of the Banks, as described above, constitutes a breech of contract in violation of the United States Code and the consumer protection laws of each State.

131. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

## COUNT X

## BREECH OF STATUTORY DUTY WITH RESPECT TO LOAN SERVICING

132. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

133. The loan servicing conduct of the Banks, as described above, constitutes a breech of statutory duty in violation of the United States Code and the consumer protection laws of each State.

134. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had

to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks'
unlawful conduct.

## COUNT XI

## BREECH OF FIDUCIARY DUTY WITH RESPECT TO LOAN SERVICING

135. The allegations in paragraphs 1 through 104 above are incorporated herein by
reference.

136. The loan servicing conduct of the Banks, as described above, constitutes a breech of
fiduciary duty in violation of the United States Code and the consumer protection laws of each
State.

137. The Banks' unlawful conduct has resulted in injury to the States and citizens of the
States who have had home loans serviced by the Banks. The harm sustained by such citizens
includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss
mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to
improper, unlawful, or undocumented foreclosures. The harm to the States includes the
subversion of their legal process and the sustained violations of their laws. The States have had
to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks'

## COUNT XII

## FRAUDULENT MISREPRESENTATION WITH RESPECT TO LOAN SERVICING

138. The allegations in paragraphs 1 through 104 above are incorporated herein by
reference.

139. The loan servicing conduct of the Banks, as described above, constitutes fraudulent
misrepresentation duty in violation of the United States Code and the consumer protection laws
of each State.

140. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

## COUNT XIII

### UNFAIR AND DECEPTIVE CONSUMER PRACTICES
### WITH RESPECT TO FORECLOSURE PROCESSING

141. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

142. The foreclosure processing conduct of the Banks, as described above, constitutes unfair or deceptive practices in violation of the United States Code and the consumer protection laws of each State.

143. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

## COUNT XIV

### DISCRIMINATION WITH RESPECT TO FORECLOSURE PROCESSING

144. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

145. The foreclosure processing conduct of the Banks, as described above, constitutes discrimination in violation of the United States Code and the consumer protection laws of each State.

146. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

## COUNT XV

### FRAUDULENT MISREPRESENTATIONS WITH RESPECT TO FORECLOSURE PROCESSING

147. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

148. The foreclosure processing conduct of the Banks, as described above, constitutes fraudulent misrepresentations in violation of the United States Code and the consumer protection laws of each State.

149.  The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

## COUNT XVI

### FRAUD WITH RESPECT TO FORECLOSURE PROCESSING

150.  The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

151.  The foreclosure processing conduct of the Banks, as described above, constitutes fraud in violation of the United States Code and the consumer protection laws of each State.

152.  The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

## COUNT XVII

### OBSTRUCTION WITH RESPECT TO FORECLOSURE PROCESSING

153.   The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

154.   The foreclosure processing conduct of the Banks, as described above, constitutes obstruction in violation of the United States Code and the consumer protection laws of each State.

155.   The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

## COUNT XVIII

## PERJURY WITH RESPECT TO FORECLOSURE PROCESSING

156.   The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

157.   The foreclosure processing conduct of the Banks, as described above, constitutes perjury in violation of the United States Code and the consumer protection laws of each State.

158.   The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to

improper, unlawful, or undocumented foreclosures. The harm to the States includes the
subversion of their legal process and the sustained violations of their laws. The States have had
to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks'
unlawful conduct.

**COUNT XIX**

**SUBORDINATION OF PERJURY**
**WITH RESPECT TO FORECLOSURE PROCESSING**

159.   The allegations in paragraphs 1 through 104 above are incorporated herein by
reference.

160.   The foreclosure processing conduct of the Banks, as described above, constitutes
subordination of perjury in violation of the United States Code and the consumer protection laws
of each State.

161.   The Banks' unlawful conduct has resulted in injury to the States and citizens of the
States who have had home loans serviced by the Banks. The harm sustained by such citizens
includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss
mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to
improper, unlawful, or undocumented foreclosures. The harm to the States includes the
subversion of their legal process and the sustained violations of their laws. The States have had
to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks'
unlawful conduct.

**COUNT XX**

**FALSE DECLARATIONS BEFORE COURT**
**WITH RESPECT TO FORECLOSURE PROCESSING**

162. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

163. The foreclosure processing conduct of the Banks, as described above, constitutes false declarations or misrepresentations before Court in violation of the United States Code and the consumer protection laws of each State.

164. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

**COUNT XXI**

**BREECH OF CONTRACT WITH RESPECT TO FORECLOSURE PROCESSING**

165. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

166. The foreclosure processing conduct of the Banks, as described above, constitutes a breech of contract in violation of the United States Code and the consumer protection laws of each State.

167. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss

mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

## COUNT XXII

### BREECH OF STATUTORY DUTY
### WITH RESPECT TO FORECLOSURE PROCESSING

168. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

169. The foreclosure processing conduct of the Banks, as described above, constitutes a breech of statutory duty in violation of the United States Code and the consumer protection laws of each State.

170. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

## COUNT XXIII

### BREECH OF FIDUCIARY DUTY
### WITH RESPECT TO FORECLOSURE PROCESSING

171. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

172. The foreclosure processing conduct of the Banks, as described above, constitutes a breech of fiduciary duty in violation of the United States Code and the consumer protection laws of each State.

173. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks'

## COUNT XXIV

### FRAUDULENT MISREPRESENTATION
### WITH RESPECT TO FORECLOSURE PROCESSING

174. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

175. The foreclosure processing conduct of the Banks, as described above, constitutes fraudulent misrepresentation duty in violation of the United States Code and the consumer protection laws of each State.

176. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to

improper, unlawful, or undocumented foreclosures. The harm to the States includes the

subversion of their legal process and the sustained violations of their laws. The States have had

to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks'

unlawful conduct.

## COUNT XXV

### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A), (a)(1)(B), (a)(1)(C) and (a)(1)(G) (2009), and 31 U.S.C. §3729(a)(1), (a)(2), (a)(3) and (a)(7) (1986)

177. The allegations in paragraphs 1 through 104 above are incorporated herein by

reference.

178. By virtue of the acts described above, the Banks knowingly and in "bad faith"

schemed to present or caused to be presented to the United States false or fraudulent claims for

payment or approval, including but not limited to improper claims for payment of FHA

residential mortgage insurance or guarantees.

179. In so doing, the Defendants acted knowingly; that is, the Banks possessed actual

knowledge that the intended claims for payment were false or fraudulent; acted in deliberate

ignorance of the truth or falsity of the claims for payment; or acted in reckless disregard of the

truth or falsity of the claims for payment.

180. By virtue of the acts described above, the Banks made, falsified, used, intended use

or caused to be made, falsified, or used, a false record, document affidavit, or statement material

to a false or fraudulent claim.

181. In so doing, the Defendants acted knowingly; that is, the Banks possessed actual

knowledge that the information, statements and representations were false or fraudulent; acted in

deliberate ignorance of the truth or falsity of the information, statements and representations; or

acted in reckless disregard of the truth or falsity of the information, statements and representations.

182.   By virtue of the acts described above, the Banks made, falsified, used, intended use or caused to be made, falsified, or used, a false record or statement material to an obligation to pay or transmit money or property to the government, and concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the United States.

183.   In so doing, the Defendants acted knowingly; that is, the Banks possessed actual knowledge that the information, statements and representations were false or fraudulent; acted in deliberate ignorance of the truth or falsity of the information, statements and representations; or acted in reckless disregard of the truth or falsity of the information, statements and representations.

184.   By virtue of the acts described above, in "bad faith," the Banks willfully conspired with each other or one or more persons: to present or cause to be presented to the United States false or fraudulent claims for payment or approval; to make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim; and, to make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government; or to conceal or improperly avoid or decrease an obligation to pay or transmit money or property to the United States.

## COUNT XXVI

### VIOLATION OF THE FINANCIAL INSTITUTIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989, 12 U.S.C. § 1833A (FIRREA)

185.   The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

186. The Banks knowingly made, schemed to make or present, or presented false and fictitious claims to Departments of the United States.

187. The claims were material to decisions of the United States and to the courts of the Plaintiff States.

188. In connection with matters within the jurisdiction of the United States, and in obstruction of law and/or justice before courts or legal proceedings (i.e. the foreclosure process) within the United States, the Banks knowingly and willfully engaged in conduct that: (a) falsified, concealed or covered up by artifices, schemes or devices, material facts, (b) made statements and representations that violate 18 U.S.C. § 1001(a), and (c) made and used false writings, affidavits, or documents knowing the same to contain materially false and fictitious statements and entries.

189. The Banks' schemes affected federally insured financial institutions, abused federal recovery funds, and willfully misused and abused federally funded programs with malicious intent.

## COUNT XXVII

### DECLARATORY JUDGMENT UNDER
### 28 U.S.C. §§ 2201 and 2202
### REGARDING THE BANKS' FORECLOSURE MISCONDUCT

190. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

191. The Banks implemented and relied on inadequate foreclosure procedures and thereby have discriminated against and prejudiced debtors, creditors, including the United States, and the courts in foreclosure cases, have caused increased errors, delays, and costs of administration in foreclosure cases, and constitute a continuing abuse of the foreclosure process.

192. The Banks implemented and relied on inadequate oversight, quality control, and foreclosure procedures and thereby have violated the standards of conduct required of creditors by applicable law, including the Foreclosure Code and the Federal Rules of Foreclosure Procedure, or have caused violations of such law.

193. The Banks implemented and relied upon inadequate foreclosure procedures that abused the foreclosure process.

194. The Banks' unlawful conduct has resulted in injury to the United States, the Plaintiff States, and to debtors in foreclosure who have had their home loans serviced by the Banks. The harm sustained by such debtors includes payment of improper fees and charges, unreasonable delays and expenses in their foreclosure cases, and imminent loss of homes due to improper, unlawful, falsified, malicious, or undocumented foreclosures. The harm sustained by the United States includes reduced and delayed recoveries to the United States in its capacity as a creditor in foreclosure cases. Such conduct has also caused the United States to assume increased administrative duties in monitoring foreclosure cases, and to incur expenses in the investigations and litigation of the Banks' unlawful conduct.

## COUNT XXVIII

### DAMAGES UNDER COMMON LAW
### RELATED TO THE BANKS' FORECLOSURE MISCONDUCT

195. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

196. The Banks implemented and relied on inadequate foreclosure procedures and thereby have discriminated against and prejudiced debtors, creditors, including the United States, and the courts in foreclosure cases, have caused increased errors, delays, and costs of administration in foreclosure cases, and constitute a continuing abuse of the foreclosure process.

197. The Banks' abuse of the foreclosure process violated a duty or duties owed by the Banks to the debtors, the courts, and other parties in such foreclosure cases, including the United States.

198. The Banks' abuse of the foreclosure process violates a federal policy, reflected in the Foreclosure Code and the Foreclosure Rules, in favor of the efficient and equitable administration of foreclosure cases, as well as the policy of ensuring accuracy in claims submitted to the foreclosure courts.

199. The Banks' unlawful conduct has resulted in injury to the United States and to debtors in foreclosure who have had their home loans serviced by the Banks. The harm sustained by such debtors includes payment of improper fees and charges, unreasonable delays and expenses in their foreclosure cases, and loss of homes due to improper, unlawful, or undocumented foreclosures. The harm sustained by the United States includes reduced and delayed recoveries to the United States in its capacity as a creditor in foreclosure cases. Such conduct has also caused the United States to assume increased administrative duties in monitoring foreclosure cases, and to incur expenses in the investigations and litigation of the Banks' unlawful conduct.

## COUNT XXIX

### VIOLATION OF THE FAIR CREDIT REPORTING ACT, 15 U.S. Code § 1681 (FCRA)

200. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

201. The Banks willfully and knowingly made, schemed to make or present, or presented false, fraudulent, materially false, and fictitious credit reports to each of the major federal

crediting bureaus or agencies (i.e. Experian, Trans Union, and Equifax) concerning Mr. Benton's credit worthiness.

202.  The Banks willfully and knowingly schemed to make or present, or presented false, fraudulent, materially false, and fictitious credit reports to each of the major federal crediting bureaus or agencies (i.e. Experian, Trans Union, and Equifax) concerning Mrs. Benton's credit worthiness.

203.  The claims were material to decisions of creditors who have used this information to deny Mr. Benton credit on multiple occasions.

204.  In connection with matters within the jurisdiction of the United States, and in obstruction of law and/or justice before courts or legal proceedings (i.e. the foreclosure process) within the United States, the Banks knowingly and willfully engaged in conduct that: (a) falsified, concealed or covered up by artifices, schemes or devices, material facts, (b) made statements and representations that violate 18 U.S.C. § 1001(a), and (c) made and used false writings, affidavits, or documents knowing the same to contain materially false and fictitious statements and entries.

205.  The Banks' schemes have negatively affected the accuracy, fairness, and privacy of information in the files of consumer reporting agencies, which has affected the federal fiduciary system, both in bad faith and with malicious intent.

## COUNT XXX

### VIOLATION OF 18 U.S. Code § 1028

206.  The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

207. The Banks knowingly made, schemed to make or present, or presented fraudulent and fictitious identification documents and related information to the courts and Departments of the United States, in violation of the Federal Foreclosure Code.

208. The identification documents and related information were material to decisions of the United States and to the courts of the Plaintiff States.

209. The foreclosure processing conduct of the Banks, as described above, constitutes fraud in violation of the United States Code and the consumer protection laws of each State.

210. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

211. In connection with matters within the jurisdiction of the United States, and in obstruction of law and/or justice before courts or legal proceedings (i.e. the foreclosure process) within the United States, the Banks knowingly and willfully engaged in conduct that: (a) falsified, concealed or covered up by artifices, schemes or devices, material facts, (b) made statements and representations that violate 18 U.S.C. § 1001(a), and (c) made and used false writings, affidavits, or documents knowing the same to contain materially false and fictitious statements and entries.

212. The Banks' schemes affected federally insured financial institutions, abused federal recovery funds, and willfully misused and abused federally funded programs with malicious intent.

## COUNT XXXI

### VIOLATION OF ANTITRUST CIVIL PROCESS ACT
### 18 U.S. Code § 1505

213. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

214. The Banks knowingly made, schemed to make or present, or presented material false, fraudulent and fictitious affidavits, documents, and related information to the courts and Departments of the United States, dully obstructing the federal foreclosure process in violation of the Federal Foreclosure Code.

215. The identification documents and related information were material to decisions of the United States and to the courts of the Plaintiff States.

216. The foreclosure processing conduct of the Banks, as described above, constitutes obstruction in violation of the United States Code and the consumer protection laws of each State.

217. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to

improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

218.  In connection with matters within the jurisdiction of the United States, and in obstruction of law and/or justice before courts or legal proceedings (i.e. the foreclosure process) within the United States, the Banks knowingly and willfully engaged in conduct that: (a) falsified, concealed or covered up by artifices, schemes or devices, material facts, (b) made statements and representations that violate 18 U.S.C. § 1001(a), and (c) made and used false writings, affidavits, or documents knowing the same to contain materially false and fictitious statements and entries.

219.  The Banks' schemes affected federally insured financial institutions, abused federal recovery funds, and willfully misused and abused federally funded programs with malicious intent.

## COUNT XXXII

### VIOLATION OF 18 U.S. Code § 1621 (PERJURY),
### 18 U.S. Code § 1622 (SUBORNATION OF PERJURY),
### & 18 U.S. Code § 1623 (FALSE DECLARATIONS BEFORE COURT)

220.  The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

221.  The Banks knowingly made, schemed to make or present, or presented material false, fraudulent and fictitious affidavits, documents, and related information to the courts and Departments of the United States, dully obstructing the federal foreclosure process in violation of the Federal Foreclosure Code.

222.  The identification documents and related information were material to decisions of the United States and to the courts of the Plaintiff States.

223.  The foreclosure processing conduct of the Banks, as described above, constitutes perjury, subornation of perjury, and false declarations in violation of the United States Code and the consumer protection laws of each State.

224.  The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

225.  In connection with matters within the jurisdiction of the United States, and in obstruction of law and/or justice before courts or legal proceedings (i.e. the foreclosure process) within the United States, the Banks knowingly and willfully engaged in conduct that: (a) falsified, concealed or covered up by artifices, schemes or devices, material facts, (b) made statements and representations that violate 18 U.S.C. § 1001(a), and (c) made and used false writings, affidavits, or documents knowing the same to contain materially false and fictitious statements and entries.

226. The Banks' schemes affected federally insured financial institutions, abused federal recovery funds, and willfully misused and abused federally funded programs with malicious intent.

## COUNT XXXIII

## VIOLATION OF CONSUMER MORTGAGE NOTE
## (BREECH OF CONTRACT)

227. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

228. The Banks knowingly made, schemed to make or present, or presented material false, fraudulent and fictitious affidavits, documents, and related information to the courts and Departments of the United States, dully obstructing the federal foreclosure process in violation of the Federal Foreclosure Code, and dully breeching the contracted and secured mortgage note for each of the said properties listed above in each of the Plaintiff States.

229. The breech and related information were material to decisions of the United States and to the courts of the Plaintiff States.

230. The foreclosure processing conduct of the Banks, as described above, constitutes a breech of contract in violation of the United States Code and the consumer protection laws of each State.

231. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

232. In connection with matters within the jurisdiction of the United States, and in obstruction of law and/or justice before courts or legal proceedings (i.e. the foreclosure process)

within the United States, the Banks knowingly and willfully engaged in conduct that: (a) falsified, concealed or covered up by artifices, schemes or devices, material facts, (b) made statements and representations that violate 18 U.S.C. § 1001(a), and (c) made and used false writings, affidavits, or documents knowing the same to contain materially false and fictitious statements and entries.

233. The Banks' schemes affected federally insured financial institutions, abused federal recovery funds, and willfully misused and abused federally funded programs with malicious intent.

## COUNT XXXIV

### VIOLATION OF THE UNITED STATES CODE
### (BREECH OF FIDUCIARY DUTY & BREECH OF STATUTORY DUTY)

234. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

235. The Banks knowingly made, schemed to make or present, or presented material false, fraudulent and fictitious affidavits, documents, and related information to the courts and Departments of the United States, dully obstructing the federal foreclosure process in violation of the Federal Foreclosure Code, and dully breeching both their fiduciary and statutory duties to the consumers and/or citizens, the United States, and the Plaintiff States under the United States Code.

236. The breeches and related information were material to decisions of the United States and to the courts of the Plaintiff States.

237. The foreclosure processing conduct of the Banks, as described above, constitutes a breach of fiduciary and statutory duties in violation of the United States Code and the consumer protection laws of each State.

238. The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and potential loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

239. In connection with matters within the jurisdiction of the United States, and in obstruction of law and/or justice before courts or legal proceedings (i.e. the foreclosure process) within the United States, the Banks knowingly and willfully engaged in conduct that: (a) falsified, concealed or covered up by artifices, schemes or devices, material facts, (b) made statements and representations that violate 18 U.S.C. § 1001(a), and (c) made and used false writings, affidavits, or documents knowing the same to contain materially false and fictitious statements and entries.

240. The Banks' schemes affected federally insured financial institutions, abused federal recovery funds, and willfully misused and abused federally funded programs with malicious intent.

## COUNT XXXV

### VIOLATION OF THE FEDERAL TRUTH IN LENDING ACT, 15 U.S.C. 1601 et seq.

241. The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

242. The Banks willfully and knowingly made, schemed to make or present, or presented false, fraudulent, materially false, and fictitious credit reports to each of the major federal crediting bureaus or agencies (i.e. Experian, Trans Union, and Equifax) concerning Mr. Benton's credit worthiness.

243. The Banks willfully and knowingly schemed to make or present, or presented false, fraudulent, materially false, and fictitious credit reports to each of the major federal crediting bureaus or agencies (i.e. Experian, Trans Union, and Equifax) concerning Mrs. Benton's credit worthiness.

244. The claims were material to decisions of creditors who have used this information to deny Mr. Benton credit on multiple occasions.

245. In connection with matters within the jurisdiction of the United States, and in obstruction of law and/or justice before courts or legal proceedings (i.e. the foreclosure process) within the United States, the Banks knowingly and willfully engaged in conduct that: (a) falsified, concealed or covered up by artifices, schemes or devices, material facts, (b) made statements and representations that violate 18 U.S.C. § 1001(a), and (c) made and used false writings, affidavits, or documents knowing the same to contain materially false and fictitious statements and entries.

246. The Banks' schemes have negatively affected the accuracy, fairness, and privacy of information in the files of consumer reporting agencies, which has affected the federal fiduciary system, both in bad faith and with malicious intent.

247. The Banks' schemes affected federally insured financial institutions, abused federal recovery funds, and willfully misused and abused federally funded programs with malicious intent.

## PLAINTIFF'S MOTION TO VOID FORECLOSURE

237.  The allegations in paragraphs 1 through 104 above are incorporated herein by reference.

238.  On or about July 13, 2011, the Banks petitioned the Court of Common Plea for the Thirteenth Judicial Circuit, Pickens County, South Carolina, for the right to foreclose on Mr. Benton's home located at 114 D University Village Drive, Central, SC, 29630.

239.  In executing the Banks unlawful foreclosure procedures, the Banks willingly and knowingly made, schemed to make or present, or presented material false, fraudulent and fictitious affidavits, documents, and related information to the courts and Departments of the United States, dully obstructing the federal foreclosure process in violation of the Federal Foreclosure Code, and dully breeching their mortgage note and/or Deed of Trust with Mr. Benton (the Contract) and both their fiduciary and statutory duties to Mr. Benton, the United States, and the Plaintiff States under the United States Code.

240. In the present action, Mr. Benton questions the standing of the Banks right to file the foreclosure action, and includes a cause of action for wrongful foreclosure, with malicious intent.

241.  The issue before the Court is inextricably intertwined with the previous claims

asserted and the consent judgments issued by this Court against WELLS FARGO in the previous

federal proceedings.

242.  Pro se plaintiff LaRay J. Benton hereby duly files this action against the Banks

wholly challenging the foreclosure action filed against him by the Banks in the Court of

Common Plea for the Thirteenth Judicial Circuit, Pickens County, South Carolina, (South

Carolina Case No. 2011CP3901026).  He seeks monetary damages and an order voiding the

foreclosure action.

243.  The Plaintiff respectfully requests that all foreclosure activities on his home be

voided immediately.

## PRAYER FOR RELIEF

WHEREFORE, the Mr. Benton, United States and the State of South Carolina

respectfully request that judgment be entered in their favor and against the Banks as follows:

1.  Void of the Banks foreclosure of Mr. Benton's home located at 114 D University

Village Drive, Central, SC, 29630, pursuant to State of South Carolina Case No.

2011CP3901026; restitution or other remedial relief to compensate Mr. Benton of the Banks'

unlawful conduct; civil penalties; loss of income; and attorney fees and costs of investigation.

2.  Injunctive relief to restrain the Banks from further unlawful conduct regarding the

schemed foreclosure and negative credit reporting on Mr. Benton's credit profile with any and all

credit bureaus and/or agencies (i.e. TransUnion, Equifax, Experian, etc.)

3.  On Counts I through XII, judgment against the Defendants, injunctive relief to restrain

the Banks from further unlawful conduct; an order requiring disgorgement of unlawful gains

obtained by the Banks as a result of their unlawful conduct; restitution in the amount of

$20,000,000.00 and/or other remedial relief to compensate Mr. Benton of the Banks' unlawful conduct; civil penalties; and attorney fees and costs of investigation.

4. On Counts XIII through XXIV, judgment against the Defendants, injunctive relief to restrain the Banks from further unlawful conduct; an order requiring disgorgement of unlawful gains obtained by the Banks as a result of their unlawful conduct; restitution or other remedial relief to compensate Mr. Benton of the Banks' unlawful conduct; civil penalties; and attorney fees and costs of investigation.

5. On Counts XXV, and XXIX through XXXV, judgment against the Defendants, for treble damages and civil penalties in an amount as the Court may determine between $5,500 and $11,000 for each violation;

6. On Count XXVI, for a civil penalty of up to $1 million dollars for each violation, plus such other relief as is in connection with each false entry or assignment, or such greater amount as provided by law;

7. On Counts XXVII and XXVIII, for appropriate declaratory relief and for compensatory damages, in an amount to be determined at trial, and for necessary post-judgment relief to prohibit the Defendants from violating 29 U.S. Code § 1109, and from acting in violation of 12 U.S.C. Chapter 38A; and

8. For all other and further relief as the Court may deem just, proper, and equitable.

**Respectfully submitted,**

**LaRay J. Benton**          **Date**
**1731 Stourbridge Court**
**Mitchellville, MD. 20721**
**(864) 357-4545 (phone)**
**laraybenton@gmail.com (email)**

## CERTIFICATE OF SERVICE

I LaRay J. Benton certify that on or about March 30, 2015, I have mailed or will mail a

copy of this motion to the following parties:

UNITED STATES OF AMERICA,
U.S. Attorney for the District of Columbia
Attn: Civil Process Clerk
555 4th Street, NW
Washington, DC 20530

UNITED STATES OF AMERICA,
United States Attorney General
Attn: Civil Process Clerk
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

CONSUMER FINANCIAL PROTECTION
BUREAU,
1700 G Street, NW
Washington, DC 20552

THE STATE OF SOUTH CAROLINA
1000 Assembly Street, Room 519
Columbia, SC 29201

WELLS FARGO & COMPANY,
420 Montgomery Street Front
San Francisco, CA 94104-1205

WELLS FARGO BANK, N.A.,
One Home Campus
Des Moines, IA 50328

HSBC NORTH AMERICA HOLDINGS
452 5th Avenue
New York, NY 10018

HSBC FINANCE CORPORATION
26525 North Riverwoods Boulevard
Mettawa, IL 60045

ROGERS TOWNSEND & THOMAS, PC
Synergy Business Park
220 Executive Center Drive
Columbia, SC 29210

SOUTHSTAR FUNDING LLC
400 Northridge Rd
Suite 1000
Atlanta, GA 30350-3328

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC
1818 Library St
Suite 300
Reston, VA 20190

**Respectfully submitted,**

**LaRay J. Benton**          **Date**

**1731 Stourbridge Court**
**Mitchellville, MD. 20721**
**(864) 357-4545 (phone)**
**laraybenton@gmail.com (email)**